Michael Anthony RONNING *v.* STATE of Arkansas

CR 87-57                                          748 S.W.2d 633

Supreme Court of Arkansas
Opinion delivered April 18, 1988
[Rehearing denied May 16, 1988.]

229

*McDaniel & Wells, P.A.*, by: *Phillip Wells*, for appellant.

*Steve Clark*, Att'y Gen., by: *William F. Knight*, Asst. Att'y Gen., for appellee.

S<small>TEELE</small> H<small>AYS</small>, Justice. Appellant Michael Ronning was

convicted of the capital murder of Diana Lynn Hanley and sentenced to life imprisonment without parole. On appeal Ronning raises twelve points. Finding no reversible error, we affirm the judgment.

In March of 1984 Diana Hanley and Darrell Meredith began living together in a house on Bridger Road in Jonesboro. Meredith was a house builder and in December, 1984 he was contacted at the job site by a man who wanted work and who identified himself as Michael Haroldson. Meredith didn't need anyone, but Haroldson came back a week later, with his wife and baby in the car, pleading for work of any kind. Meredith put him to work on December 6. When another worker quit Meredith hired Larry Brown, and Haroldson and Brown drove to work together from Pocahontas in an old Plymouth automobile belonging to Haroldson. The car, a 1965 model, was cream colored, badly rusted, and emitted dense smoke from the exhaust.

On Friday, January 3, Haroldson and Brown came to Meredith's house to be paid. Meredith had about $1,100 in cash in a lock box. Meredith asked the two men to wait outside while Diana retrieved the lock box from its hiding place and Meredith proceeded to pay them, Haroldson receiving $77. Meredith testified that he noticed Haroldson look at the money in the lock box several times and that he "got real quiet."

On Monday Meredith got up at the usual time, had coffee with Diana and left for work about 7:20 a.m. Diana was wearing a red robe Meredith had given to her for Christmas. Meredith went straight to the job site where Brown was waiting for him. Haroldson did not show up for work that day.

When Meredith got home that evening Diana's Corvette was in the driveway but she was not there. Her coat was still where she had left it the night before and her purse, cigarettes and billfold were beside the couch. There was no money in her purse. Meredith called several friends to see if they knew where Diana might be and when he was unable to locate her he became worried and called the sheriff. While waiting for a deputy to come he thought of the lock box and found that it was empty. It had contained seven $100 bills after he and Diana had withdrawn some of the money over the weekend. He later discovered that a large Bowie knife was missing from the kitchen.

Attention quickly focused on Michael Haroldson because of reports that a car matching the description of the Plymouth was seen in the driveway of Meredith's home on the morning of Diana Hanley's disappearance.

The Sheriff of Randolph County was contacted. He undertook an investigation and learned that Michael Haroldson was in fact Michael Ronning, and was wanted on burglary charges in Michigan. The Ronning home was watched and at 10:30 p.m. the Plymouth automobile was observed, though Ronning was not there. Ronning's wife gave the officers the clothes Ronning had worn that day. Eventually a search of the area was begun and Ronning was found hiding in some shrubbery about seventy-five yards behind the house. He was taken into custody during the early hours of January 7, 1985.

On January 19 a trapper found the body of Diana Hanley. It was located a half mile off the O'Kean Cut-off road between Pocahontas and O'Kean, partially covered with branches. Diana Hanley's throat had been cut by three stab wounds from a large knife. There were bruises to the left side of the jaw. Her garments, including the red robe, were up around her shoulders exposing the lower two-thirds of her torso. There were scratches and abrasions on her upper thighs. She had been bound at the hands and feet. In the opinion of the medical examiner she had been raped, though the lapse of time rendered that opinion conjectural.

I

## THE COURT ERRED IN FAILING TO DISMISS THE INFORMATION AGAINST APPELLANT ON THE BASIS OF IMPROPER VENUE.

Michael Ronning was arrested in Randolph County, where the body of Diana Hanley was discovered. She was last seen alive in Craighead County, where the information was filed charging Ronning with burglary, kidnapping and murder.

Ronning cites Ark. Code Ann. § 16-88-109 (1987) [Ark. Stat. Ann. § 43-1417 (Repl. 1977)], providing that when two or more counties have jurisdiction of the same offense, the county in which the defendant is first arrested shall proceed to try the offense to the exclusion of the others. He also cites language from

*Fairchild* v. *State*, 284 Ark. 289, 681 S.W.2d 380 (1984), to the effect that because the victim was kidnapped in Pulaski County and murdered in Lonoke County, venue was proper in the county where the murder occurred. Since Ronning was arrested in Randolph County and the murder presumably occurred in Randolph County, Ronning argues that a defense motion to transfer to Randolph County should have been granted.

■ We need not determine whether venue lay in Randolph County to the exclusion of Craighead County because before the motion to transfer was filed the defense asked for, and was granted, a change of venue. The case was transferred to Crittenden County where the trial was held. It was not error for the court to refuse a second request for a venue change. Ark. Code Ann. § 16-88-203 (1987) [Ark. Stat. Ann. § 43-1518 (Repl. 1977)].

## II

### THE COURT ERRED IN FAILING TO GRANT A MISTRIAL WHEN SHERIFF JOHNSON TESTIFIED THAT THE APPELLANT WAS BEING HELD ON MICHIGAN CHARGES.

During the prosecutor's interrogation of Craighead Sheriff Floyd Johnson, Johnson spoke of conversations with Ronning as to the possibility of Ronning being released on bond. He was asked, "And most of those questions related to his getting out on bond?" Answer: "Yes sir. He told me that — when I informed him that we would probably hold him on a burglary charge based on the information that we had at that point — he told me that he wasn't too concerned about the charges in Michigan and he wasn't too concerned about the burglary."

■ The answer prompted a motion for a mistrial which the trial court denied. Appellant points to Rule 404(b) of the Arkansas Rules of Evidence which excludes evidence of other crimes to show the character of a defendant in order to prove the defendant acted in conformity therewith. *Alford* v. *State*, 223 Ark. 330, 266 S.W.2d 804 (1954). However, it seems clear the reference to Michigan charges, the nature of which were not disclosed, was not deliberately prompted by the question and the trial court's admonition to the jury to disregard the remark was a

sufficient handling of the incident. *Foster* v. *State*, 285 Ark. 363, 687 S.W.2d 829 (1985).

## III

### THE COURT ERRED IN FAILING TO GRANT A MISTRIAL IN THAT ONE OF THE JURORS STATED IN OPEN COURT THAT HE WAS HARD OF HEARING AND THERE WERE "SKIPS" IN HIS HEARING THE TESTIMONY.

During the state's closing argument in rebuttal one of the jurors asked counsel to speak up and expressed some difficulty in hearing the arguments, resulting in this exchange:

| | |
|---|---|
| The Court: | Were you able to hear the evidence presented in this case? |
| Juror: | Yes. |
| The Court: | You didn't have trouble with the evidence — the testimony you heard? |
| Juror: | There were some skips. |
| The Court: | Do you feel that you heard all the testimony? |
| Juror: | Right. |

Appellant moved for a mistrial, which was denied, and on appeal cites case law that a juror who is physically unfit to discharge the duties of a juror, or who is incapable of hearing the testimony, is not qualified. *Commonwealth* v. *Brown*, 231 Pa. Super. 431, 332 A.2d 828 (1974); *State* v. *Reed*, 10 So. 2d 28 (La. 1944); *Bell* v. *O'Connor Transport, Limited*, 94 Idaho 406, 489 P.2d 439 (1971). Appellant submits that a trial should not only be fair, but should have the appearance of fairness as well. *Henslee* v. *State*, 251 Ark. 125, 471 S.W.2d 352 (1971).

While we do not dispute the authority for this point, we disagree that the fairness of the trial, or its appearance, was undermined by this development. We find no significant inability by the juror to hear the testimony. He acknowledged some "skips" but he maintained he had heard all the testimony. Without more, we cannot conclude that the trial court's broad discretion to act upon mistrial motions was improperly exercised by refusing to abort the trial. *Combs* v. *State*, 270 Ark. 496, 606

S.W.2d 61 (1986).

## IV

### THE CONVICTION OF THE APPELLANT SHOULD BE REVERSED DUE TO NUMEROUS REFERENCES MADE BY THE PROSECUTING ATTORNEY IN HIS CLOSING ARGUMENT OF THE APPELLANT'S FAILURE TO TESTIFY.

Appellant cites a number of instances in closing argument when the prosecutor allegedly violated the principle established by *Griffin* v. *California*, 380 U.S. 609 (1965), that the decision of a defendant not to testify in his own behalf may not be argued as evidence of guilt. We will not report all the rather lengthy excerpts relied on, as we find only one objection to these remarks and that was on a wholly different basis than now argued.

We quote from the record, p. 1055:

They not only did that with this place of business that Victoria Ronning had told them this defendant had been at, but they also checked out other coffee shops and truck stops to see if they could find anyone who saw this defendant drinking coffee or served him coffee or saw him getting his car boosted or having trouble with his car, and they were unable to elicit any person that could come before you and say that he was there like he told Victoria Ronning he was. Now why was he lying about that? Why do you lie if the truth won't hurt you?

[Defense Counsel]:

Your honor, I'm going to have to object as far as he's saying that he's lying. It's not been proven through any kind of testimony that he was lying.

[Prosecutor]:

Your Honor, this is closing argument.

[Defense Counsel]:

I understand this is closing argument, but I think he's gone a little too far in saying that he's lying.

[The Court]:

Ladies and gentlemen, the Court will instruct you — as I've previously done — that opening statements, remarks during the trial and closing arguments of the attorneys are not evidence but are made only to help you in understanding the evidence and applicable law. Any arguments, statements or remarks of the attorneys having no basis in the evidence should be disregarded by you.

Gentlemen, you're permitted to argue any reasonable inferences from what's been received in evidence.

Ladies and gentlemen of the jury, it will be for you to determine what has been received in evidence and your recollection of the evidence. Alright, you may continue.

■ The objection, clearly, was to the prosecutor's argument that Michael Ronning was lying when he told his wife he was at the 76 Truckstop at the time of Diana Hanley's disappearance. There was no objection based on the defendant's failure to testify in his own behalf. In hundreds of cases we have repeated the fundamental rule that an argument for reversal will not be considered in the absence of an appropriate objection in the trial court. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982); *Wicks* v. *State*, 270 Ark. 781, 606 S.W.2d 366 (1980).

V

THERE WAS NOT SUBSTANTIAL EVIDENCE OF RECORD TO SUPPORT THE VERDICT OF GUILTY RETURNED BY THE JURY.

■ Appellant submits the evidence of guilt was insufficient to support the verdict. Noting that the proof was entirely circumstantial, he asserts the evidence must be consistent with the guilt of the accused and inconsistent with any other reasonable hypothesis. *Ward* v. *State*, 6 Ark. App. 349, 642 S.W.2d 328 (1982). However, this standard for weighing the evidence is addressed to the jury, as on appeal we view the evidence only to determine whether there is substantial evidence to support the verdict. *Cassell* v. *State*, 273 Ark. 59, 616 S.W.2d 485 (1981).

■■ We reject the contention that there was no substantial evidence of guilt. The evidence, viewed in the light most favorable to the state and with all reasonable inferences consis-

tent therewith, fully supports the verdict. The circumstances which point in that direction are these: On Friday afternoon when he paid Brown and Ronning, Meredith noticed Ronning's interest in the cash in the lock box and that Ronning got very quiet as he observed it. On Monday morning Meredith expected to find Ronning at work but Ronning failed to appear at the job throughout the day. There is evidence that Victoria Ronning, too, thought Ronning was going to work on Monday when he left the house. Numerous witnesses testified to the fact that a vehicle matching Ronning's automobile, which was conspicuous for several reasons, was seen in the driveway at the Meredith residence from about 8:15 a.m. until as late as 10:30 or 11:00. Kenneth Ray Brewer saw the car at about 8:10 and noticed a person beside the car. He had the "impression" it was a man. Floyd Stonecipher passed the Meredith house between 7:45 and 8:00 a.m. and saw an old, rusty white car of Chrysler make with a Michigan license plate. The Corvette was also in the drive. Gary Keyser saw the car as described about 8:00 o'clock that morning. Steve Tyler saw the car around 8:00 and noticed that it did not have an Arkansas license plate. When he came back by between 10:30 and 11:00 he did not see the car. Kathy Hall testified that as she was going to work on that morning at "shortly after ten," no later than 10:20, a car pulled onto Hwy. 49 from Bridger Road which startled her because it did not stop. The car was old, with rust spots, and smoked rather badly. The car she saw resembled a photograph of the Ronning car and contained two people. One neighbor, Mr. Riley Futrell, testified he saw the car in the drive between 12:00 and 12:30, which is later, by perhaps an hour or more, than the other witnesses. However, inconsistencies in the testimony are matters for the jury.

Mary Meyer testified that as she drove from Jonesboro to Brookland that morning around 10:15 a car meeting her swerved unexpectedly toward her and attracted her attention. A man was driving with a woman passenger. As the cars passed she had direct eye contact with the woman, who looked "scared to death." The car matched the Ronning vehicle and had out of state tags. The witness was vaguely aware of a laundry basket in the backseat with something red draped over it. She identified Michael Ronning as the driver and was "75% sure" the passenger was Diana Hanley. Harry Gordon testified that on January 6

he took his wife to work at the Black River Vo-Tech. Sometime between 10:15 and 10:45 he saw Michael Ronning with a female passenger headed toward the O'Kean Cut-off.

There was proof that some of the fibers from the red robe were on the floor of the Ronning vehicle and two such fibers were recovered from the jeans worn that day by Michael Ronning. There was also proof that Ronning was familiar with the O'Kean Cut-off. Doyle Bruce testified that he operated a furniture and vehicle upholstery shop in Pocahontas and Victoria Ronning worked for him. He said that on the morning of January 6 Michael Ronning came to the shop a few minutes before 11:30, that Victoria was surprised to see him and asked him why he wasn't working. Michael told her he had had car trouble, that he had stopped at the 76 Truckstop in Walnut Ridge for coffee. There was testimony from investigating officers that none of the employees at the 76 Truckstop could identify Michael Ronning as having been there the morning of January 6.

Other pertinent circumstances included evidence that on Friday evening Ronning took his tools from Meredith's truck where he ordinarily left them; that a pair of gloves was found in the Ronning vehicle after it was impounded, though Ronning never used gloves at work and had once refused Meredith's offer to furnish him with a pair; that while Ronning was in jail before the discovery of Diana Hanley's body Mrs. Ronning talked to him in the presence of Officer Dickie Howell. Officer Howell said Mrs. Ronning told Michael that the police knew he had not gotten the money by forging a check, as he had said, and the police wanted to know where he got the money. Howell said Ronning became upset and said, "Shut-up, you son of a bitch, about that extra money I had. Don't you tell anybody about the money." Mrs. Ronning began to cry and left. Officers tried unsuccessfully to subpoena Mrs. Ronning for trial but were unable to locate her although two officers had gone to Dallas in an attempt to find her.

Two final circumstances are consistent with guilt: The testimony of Sheriff Johnson that while in custody and after having been given the Miranda warnings Ronning told him that he might be able to help the sheriff on the burglary but that he could not help with locating the woman; and the fact that Ronning attempted to hide when the police began looking for

him. As might be expected, there were circumstances pointing toward other possibilities, but in determining the sufficiency of the evidence we do not weigh evidence on one side against the other, we simply determine whether the evidence in support of the verdict is substantial. *Ricketts* v. *State*, 292 Ark. 256, 729 S.W.2d 400 (1987).

## VI

THE COURT ERRED IN RULING THAT AN IN CUSTODY STATEMENT MADE BY THE APPELLANT QUALIFIED AS EITHER A CONFESSION OR A DECLARATION AGAINST INTEREST, AND THEREFORE ADMISSIBLE IN EVIDENCE AT TRIAL.

## VII

THE COURT ERRED IN ADMITTING THE STATEMENT MADE BY THE APPELLANT TO SHERIFF JOHNSON IN THAT AFTER APPELLANT REQUESTED TO HAVE AN ATTORNEY APPOINTED, ALL QUESTIONING BY SHERIFF JOHNSON SHOULD HAVE CEASED.

Points VI and VII are closely related and will be considered together. By pretrial motion appellant asked the trial court to rule that the state could not introduce either as a confession or as a declaration against interest a remark attributed to Ronning by Sheriff Floyd Johnson, that Ronning told the sheriff he could possibly help him with the burglary, but could not help in locating Diana Hanley.

Appellant argues that the remarks, even if made, constitute neither a confession, nor an admission against interest. He points out that a confession is an admission of guilt [*Workman* v. *State*, 267 Ark. 103, 589 S.W.2d 20 (1979)], which this is not, and a declaration against interest is one which is contrary to the pecuniary or proprietary interest of the declarant and, hence, admissible as an exception to the hearsay rule. A.R.E. Rule 804(b)(3). But it is not necessary that the admissibility of the remarks rest on one or the other of these categories, but on whether they are relevant and were intelligently made pursuant

to the Miranda warnings, that is, with an awareness by the declarant that the remarks could be used as evidence. As to their relevancy, that involves the trial court's discretion, and it hardly taxes the concept of relevancy to point out that for Ronning to profess some knowledge concerning a burglary of the Meredith dwelling, which coincided with the disappearance of Diana Hanley, is a circumstance bearing on the probability that Ronning was involved in her disappearance and murder. A.R.E. Rules 401 and 402. As to the Miranda warnings, no serious argument can be made that they were not given Michael Ronning. Officer Howell testified that he twice administered the Miranda warnings and Ronning acknowledged in writing that he understood the warnings. Ronning did not dispute this testimony and acknowledged that he understood his rights.

Turning to the other point, No. VII, Ronning contends Sheriff Johnson ignored the doctrine of *Edwards* v. *Arizona*, 451 U.S. 477 (1981), by continuing to question him after Ronning had invoked his sixth amendment right to counsel. But the express finding of the trial court was that Ronning's remarks came in the course of a conversation which Ronning initiated and following a statement, rather than a question, from Johnson. The abstract of the suppression verifies this finding by quoting Ronning's testimony verbatim: "Yes, my statement about being able to help was a response to his question. This was toward the end of the conversation. *It was a response to a statement of his, I guess, not a question.*" [Our italics.]

## VIII

### THE COURT ERRED IN FAILING TO GRANT APPELLANT PERMISSION TO HAVE CERTAIN PHYSICAL EVIDENCE BY APPELLANT'S EXPERT WITNESS PRIOR TO TRIAL.

Appellant maintains that by pretrial motion he asked that the red fibers recovered from Ronning's gloves, blue jeans and car be sent to Dr. Irving Stone of Dallas, Texas, employed by the defense for scientific analysis, but the state objected on grounds the fibers might be lost. Appellant concedes the trial court ordered the state crime lab to make the fibers available to the defense but since appellant lacked the funds to bring Dr. Stone to Little Rock, he urges the trial court should have ordered the fibers

delivered for analysis. The record indicates, however, that "numerous fibers" were mailed to Dr. Stone for examination, while others (presumably the two recovered from the blue jeans) were not, but were available at all times for inspection by the defense.[1] We cannot say the trial court's broad discretion over such matters was abused by this handling of the issue.

## IX

THE CONVICTION OF THE APPELLANT SHOULD BE REVERSED DUE TO IMPROPER COMMENTS MADE BY THE PROSECUTING ATTORNEY CONCERNING THE ABSENCE AT TRIAL OF APPELLANT'S WIFE, VICTORIA RONNING.

Appellant advances the argument that prejudicial error occurred during closing argument when the prosecutor told the jury:

> You heard the testimony about Victoria Ronning. You heard Officer Howell testify about trying to find her, trying to get her subpoenaed to bring her into court, and you heard him say that he even went to Dallas, Texas, to try to find her, but to no avail. *And what does that tell you, inferentially?* (R. 1054).

However, the remarks were not objected to and, therefore, the allegation of error may not be argued on appeal. *Perry* v. *State*, 277 Ark. 357, 642 S.W.2d 865 (1982).

## X

THE CONVICTION OF THE APPELLANT SHOULD BE REVERSED BASED ON COMMENTS MADE BY THE PROSECUTING ATTORNEY THAT WERE INTENDED TO INFLAME THE JURY AGAINST APPELLANT.

At separate points in closing argument counsel for the state made these comments:

---

[1] Record, p. 99.

I think what you are talking about here is a psychopathic killer, and these people, they feel no remorse, they feel no pain of conscience.

\* \* \* \* \*

And realize that if you are wrong, you are going to turn a psychopathic killer loose.

\* \* \* \* \*

Don't turn him loose to run amidst the law abiding people of this area, and any other area he might go.

▇ No objection was offered to the first and third excerpts. Following the second, defense counsel interposed an objection to the characterization, "psychopathic killer," which the trial sustained, again reminding the jury that closing argument was only an aid to the jury and not evidence. The objection having been sustained and the jury admonished, no error occurred.

## XI

THE VERDICT OF THE APPELLANT SHOULD BE REVERSED IN THAT THE APPELLANT WAS DENIED A FAIR TRIAL DUE TO NUMEROUS LEADING QUESTIONS ASKED BY THE PROSECUTING ATTORNEY DURING THE STATE'S CASE.

## XII

THE CUMULATIVE EFFECT OF THE ERRORS OF THE TRIAL COURT AND THE PROSECUTING ATTORNEY TAINTED THE PROCEEDINGS AND AMOUNTED TO CUMULATIVE ERROR REQUIRING REVERSAL.

In the recent case of *Alexander* v. *Chapman*, 289 Ark. 238, 711 S.W.2d 765 (1986), we reversed a medical malpractice case because there was a pervasive misuse of leading questions by the defense in the production of evidence which the trial court was unable to control. Appellant cites this language from the *Alexan-*

*der* decision:

> There are limits to everything and when counsel cannot or will not abide by the rules of evidence and of the trial court, and the trial court cannot stop the violations, we have to. The contention on appeal is that although not one instance of counsel's conduct would be cause for reversal, all of the violations combined to deny the appellant a fair trial.

In this case we have examined the ten specific instances of leading questions by counsel for the state cited by the appellant. However, this was a lengthy trial and there was an evident attempt by counsel to comply with the trial judge's directive to avoid leading questions. We are satisfied the situation is not comparable to *Alexander* v. *Chapman.*

We have examined all other objections made during the trial pursuant to Rule 11(f), Rules of the Supreme Court and Court of Appeals, and find no error. *See Earl* v. *State*, 272 Ark. 5, 612 S.W.2d 98 (1981).

Finding no error, the judgment is affirmed.