Joe Louis DANSBY *v.* STATE of Arkansas

CR 97-1415 1 S.W.3d 403

Supreme Court of Arkansas
Opinion delivered October 7, 1999
[Petition for rehearing denied November 11, 1999.]

*Bramblett & Pratt,* by: *Eugene D. Bramblett,* for appellant.

*Mark Pryor,* Att'y Gen., by: *Sandy Moll,* Ass't Att'y Gen., for appellee.

ANNABELLE CLINTON IMBER, Justice. Mr. Joe Louis Dansby was convicted of two counts of capital murder in the deaths of a young Nevada County couple and the jury imposed the death penalty. Accordingly, our jurisdiction is authorized pursuant to Ark. S. Ct. R. 1-2(a)(2) (1999). Mr. Dansby raises six assignments of error on appeal. We find no merit in any of the points raised, and we affirm the judgment of conviction.

On a Saturday afternoon in May, 1992, Malissa Clark and her boyfriend, Jeffrey Lewis, left her residence to go riding on a four-wheeler. Early the next morning, Ms. Clark's parents discovered that she had not returned home. Law enforcement authorities immediately began to search for the couple. By noon that day they had found a pair of pink panties, a pair of gym shorts stained with blood, some weight lifting gloves, a part of a gun rack, and several expended .22 shell casings in a rural area off of Potlatch Road in Nevada County. This area was designated as Crime Scene 1. Later that same day, the bodies of Mr. Lewis and Ms. Clark were found several miles away from Crime Scene 1 in another rural area off of County Road 422. This area was designated as Crime Scene 2. Mr. Lewis's body was in the bed of his pickup truck along with his four-wheeler. Ms. Clark's naked body was lying in the road. Paint found on a stump at the first crime scene matched the paint on Mr. Lewis's damaged pickup.

Both victims had multiple gunshot wounds inflicted by a .22 rifle, and both ultimately died from gunshot wounds delivered to the head at close range. The Medical Examiner at the State Crime Laboratory recovered .22 bullet fragments from their bodies and also took blood, hair, and vaginal samples. Evidence from the second crime scene indicated that at least one of the victims had been shot inside the truck and that both victims had been placed in the bed of the truck at some point. Several expended .22 shell casings were also recovered at Crime Scene 2. No fingerprints were recovered from either scene. Ms. Clark's clothing and an amplifier from inside Mr. Lewis's truck were also never recovered.

During the course of the homicide investigation, Mr. Joe Louis Dansby became a suspect. On August 27, 1993, he consented to a·search of an area surrounding his home by Arkansas State Police Investigators Lt. Finis Duvall and Sgt. Jack Ursery. However the search for .22 shell casings produced no results. On October 19, 1993, Sheriff Abb Morman and Deputies Wayne Kisselburg and Heb Sorrells went to Mr. Dansby's home to retrieve him for purposes of obtaining blood and handwriting samples pursuant to a seizure warrant signed by a circuit judge. While at Mr. Dansby's residence, Sheriff Morman located and recovered

four expended .22 shell casings, one from the back porch and three more from the surrounding yard. The officers finally located Mr. Dansby nearby at his brother's home as they were leaving the residence. Mr. Dansby was shown a copy of the warrant, and then accompanied the officers to Dr. Young's office where the blood sample was to be taken.

Lt. Duvall met the officers and Mr. Dansby at Dr. Young's office. Ms. Janice Nolan, an LPN, drew blood from Mr. Dansby and filled three tubes. According to Ms. Nolan, she initialed and dated each tube before placing them into a plastic bag. Then she sealed the bag with tape, initialed the tape herself, and then had Mr. Dansby initial the tape. Finally, she gave the bag to Lt. Duvall, who delivered it the next morning to the State Crime Laboratory. Although Lt. Duvall thought that Ms. Nolan had only given him two tubes of blood in the plastic bag, and so indicated on the evidence submission form that accompanied the blood sample to the laboratory, Mr. Kermit Channel, a serologist with the State Crime Laboratory, testified that he received a sealed plastic bag on October 20, 1993, that contained three tubes of blood, two bearing the date of October 19, 1993, and one bearing the date of October 9, 1993. According to Mr. Channel, the initials of Ms. Nolan and Mr. Dansby were displayed on the seal of the bag and all three tubes bore Ms. Nolan's initials. She confirmed that those initials were in her handwriting and that she had probably made a mistake when writing the date on the tube of blood dated October 9, 1993. Mr. Channel prepared swatches from the tube bearing the October 9, 1993 date and sent them to the FBI Crime Laboratory for DNA testing. By report dated June 17, 1995, the FBI DNA Analysis Unit found that Mr. Dansby's blood matched the semen taken from the victim. Swatches were also sent to Cellmark Diagnostics, a private laboratory, which also declared Mr. Dansby to be a match. At trial, Mr. Dansby objected to the introduction into evidence of the DNA test results on grounds that the State failed to establish a proper chain of custody. The trial court overruled that objection and admitted the DNA test results into evidence.

The trial court also denied Mr. Dansby's motion to suppress the introduction into evidence of the .22 expended shell casings

found by Sheriff Morman at Mr. Dansby's home. According to a receipt from Sgt. Ursery, those four .22 shell casings were delivered by Sheriff Morman to Sgt. Ursery on October 19, 1993. At the suppression hearing, Sheriff Morman and Deputy Kisselburg testified that a report about the discovery was placed in the case file. Those shell casings were eventually submitted to the State Crime Laboratory on February 8, 1994. Before Mr. Berwin Monroe, Chief Firearms and Toolmarks Examiner at the State Crime Laboratory, examined and tested the four .22 shell casings, they were forwarded along with other evidence to the Bureau of Alcohol and Firearms Forensic Science Laboratory and to the FBI Laboratory in 1994 and 1995. In May 1996, the four shell casings were finally returned to the State Crime Laboratory, at which time Mr. Monroe completed his examination and concluded that one of the four shell casings found at Mr. Dansby's home matched the shell casings found at Crime Scenes 1 and 2.

Mr. Dansby was charged in Nevada County on July 13, 1995 with two counts of capital murder. On July 11, 1996, the trial court granted Mr. Dansby's request that venue be changed from Nevada County to Miller County. Seven months later, on February 18, 1997, after he retained new counsel, Mr. Dansby filed a motion to withdraw the earlier request for a change of venue, asserting that he now wanted to be tried in Nevada County where the crimes were committed. The trial court denied Mr. Dansby's motion.

Mr. Dansby's trial began in Miller County on April 7, 1997, with an extensive voir dire of the jury by the trial judge. Voir dire by the attorneys was primarily focused on how the members of the jury panel felt about the death penalty. Mr. Christopher Conner was the first African-American drawn for consideration as a juror. After the State used one of its peremptory challenges to excuse Mr. Conner, Mr. Dansby posed a *Batson* challenge to the State's strike. The State responded that Mr. Conner's views on the death penalty indicated that he would not seriously consider it as a sentencing option. The trial court then overruled Mr. Dansby's *Batson* objection.

During the trial, the State called Mr. Jackie Wayne Cooper, a habitual offender with seven prior convictions, to testify as a witness during its case-in-chief. Mr. Cooper testified that Mr. Dansby had told him about the murders when they were both incarcerated in the Nevada County jail. According to Mr. Cooper, Mr. Dansby confessed to committing the murders and told him certain details about the crime. Mr. Dansby took the stand in his own defense and denied making a confession to Mr. Cooper. Prior to his cross-examination by the State, the trial court ruled that Mr. Dansby had waived his spousal privilege because a third party had testified that Mr. Dansby made a confession to him. The State then proceeded to cross-examine Mr. Dansby about his statements to his wife, whereupon he denied ever making a confession to her. Mr. Dansby's wife, Betty Dansby, was then called as a rebuttal witness for the State. The trial court reiterated its prior ruling that the husband-wife privilege had been waived and permitted Mrs. Dansby to testify that Mr. Dansby told her that he killed the kids, threw the gun in the gravel pit, and that, if she loved him, she wouldn't tell anyone.[1]

During its cross-examination of Mr. Dansby, the State also sought to introduce certain "pornographic" magazines seized at his former home. The trial court held an *in camera* hearing on the admissibility of this evidence. In that hearing, the State asked Mr. Dansby whether the magazines in fact belonged to him, to which he responded, "If it's something that is gonna hurt me, my answer is no." The State then moved for permission to question Mr. Dansby in front of the jury about this response. While the trial court agreed with the defense that the pornographic magazines were not admissible, it nonetheless ruled that Mr. Dansby's response reflected on his credibility and was a proper subject of cross-examination. The jury then heard Mr. Dansby acknowledge his previous statement.

---

[1] A .22 Marlin rifle was recovered from the gravel pit shortly after Mrs. Dansby disclosed her husband's confession to the deputy prosecuting attorney in January, 1994. Mr. Dansby's son, Jackie Dansby, identified this particular rifle as belonging to his father, and Mr. Dansby himself admitted that he had his .22 rifle the day before the bodies were discovered at Crime Scene 2, although he claimed that someone had stolen the rifle from his automobile that same evening.

Following a lengthy trial that concluded on April 24, 1997, the jury found Mr. Dansby guilty of two counts of capital murder and sentenced him to death on both counts. Mr. Dansby now appeals that conviction and raises six points for reversal: (1) the trial court erred in denying his motion to withdraw the request for a change of venue; (2) the trial court erred in overruling his *Batson* challenge; (3) the trial court erred in denying his motion to suppress the introduction of four spent .22 shell casings; (4) the trial court erred in admitting into evidence the DNA test results; (5) the trial court erred in ruling that Mr. Dansby had waived the husband-wife privilege; and (6) the trial court erred in allowing the State to cross-examine Mr. Dansby about statements that he made during an *in camera* hearing.

## Venue

For his first point on appeal, Mr. Dansby asserts that the trial court erred in denying his motion to withdraw a previous request for change of venue. He asserts that he was not asking the court to change the venue of the trial back to Nevada County. Rather, he characterizes the motion as merely an attempt to withdraw his previous request that venue be changed to a county other than Nevada County. In a related argument, he contends that the trial court's denial of the motion violates his constitutional right to trial in the county in which the crime was committed. Both arguments are without merit.

Article 2, Section 10, of the Arkansas Constitution states:

> In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by impartial jury of the county in which the crime shall have been committed; *provided that the venue may be changed* to any other county of the judicial district in which the indictment is found, upon the application of the accused, *in such manner as now is, or may be, prescribed by law.*

(Emphasis added.) According to the plain language of this constitutional provision, a defendant's constitutional right to be tried in the county where the crime was committed is qualified by the defendant's right to apply for a change of venue "in such a manner as now is, or may be, prescribed by law." Ark. Const. Art. 2,

§ 10. Thus, Article 2, section 10, of the Arkansas Constitution contemplates that the manner by which venue may be changed will be determined by legislative enactment. To that end, the legislature has enacted Ark. Code Ann. § 16-88-203 (1987), which states that "[o]nly one change of venue shall be granted in any criminal case or prosecution."

██ We have held that this section is not unconstitutional on its face. *Swindler v. State*, 267 Ark. 418, 592 S.W.2d 91 (1979). We have further noted that the decision of whether or not to grant a change of venue, even a second one, is one that rests within the trial court's discretion. *Ronning v. State,* 295 Ark. 228, 748 S.W.2d 633 (1988); *Perry v. State,* 279 Ark. 357, 642 S.W.2d 865 (1982). Both *Ronning* and *Perry* state that it is not an abuse of discretion for the trial court to refuse a defendant's request for a second change of venue. *Ronning, supra; Perry, supra.*

At a pretrial hearing held on December 11, 1995, in the Circuit Court of Nevada County, the State indicated it would not oppose a change of venue in light of the amount of pretrial publicity that this case had generated in Nevada County. At a pretrial hearing on January 8, 1996, Mr. Dansby advised the court that he wanted to be tried in Nevada County. However, at another pretrial hearing held on July 11, 1996, Mr. Dansby's counsel informed the court that Mr. Dansby wanted to have venue transferred to another county. When this request was made, the following exchange took place:

> MR. HALE (*Counsel for Defendant*): But, we would make a verbal motion and just following up on what Mr. Haltom said and I've talked to Mr. Dansby again this morning and that's correct at this time, we would make a motion to transfer venue, and I will follow up with a written motion, Judge, but this just came about yesterday or day before when I visited with Joe over at the county jail, and he asked me if I would make a motion to transfer venue. And now, I'm formally making that motion for the court to consider . . . .

> THE COURT: Mr. Dansby, I just, you're present, of course, here, and you've heard the statements of your attorney, Mr. Hale. Is, do you now concur that may, you have conferred with your

attorney, do you concur with him that a change of venue may be in your best interest?

MR. JOE LOUIS DANSBY: Yes.

\* \* \*

THE STATE: . . . We'd hate to order a change of venue to Miller County and about, or some other county, and about the time we go to trial, he decides he wants it back in Nevada County. But, if that's what he wants and if the State stipulates to a change of venue, we think the record needs to be clear that the next time he changes his mind, we may oppose it. We want him just as we wanted him bound with his decision to try it in Nevada County back on January of '96, if he's changed his mind and wants a change of venue now and the State agrees to that, we want him to know that he's bound by that, and he can't just keep changing his mind and because Joe decides he wants another county, do it. It's a matter that the State does not have to agree to and the Court does not grant, but apparently, he's got the opinion that just whatever Joe wants, Joe gets. And I think the record needs to be clear that that's not true. But, if he agrees to a change of venue to another county and the Court orders it, the fact that he subsequently changes his mind and maybe wants to come back to Nevada County doesn't mean that that will happen.

After hearing responses from both sides, and no opposition from the State, the trial court transferred venue from Nevada County to Miller County on July 11, 1996.

Nevertheless, on February 18, 1997, after Mr. Dansby retained new counsel, he moved to withdraw his earlier request for change of venue. In support of this motion, he argued that no real steps had been taken to change venue to Miller County, other than an entry on the court's docket, noting that the record still remained in Nevada County as did all the witnesses and evidence. The trial court, however, pointed out that arrangements had already been undertaken to schedule the trial in Miller County, and that Mr. Dansby had been warned in July 1996 when he requested a change of venue to Miller County that another request for change of venue back to Nevada County might not be granted. The trial court also observed that no real justification had been presented for transferring the trial back to Nevada

County, and that such a transfer would result in further unnecessary delays. For these reasons, the trial court denied Mr. Dansby's motion.

In *Ford v. Wilson*, 327 Ark. 243, 939 S.W.2d 258 (1997), we faced a similar situation when we denied Mr. Ford's petition for a writ of prohibition to prohibit the circuit court from trying him in Mississippi County. In *Ford*, the crime occurred in Crittenden County, but was transferred to Mississippi County upon Mr. Ford's motion for a change of venue. After Mr. Ford's conviction was vacated by a federal district court, Mr. Ford contended that venue should be fixed in Crittenden County, where the information against him was filed. He argued, as Mr. Dansby does, that Ark. Const. art. 2, § 10, entitled him to a trial in the county where the crime was committed. We held that, regardless of the vacation of sentence by the federal district court, Mr. Ford remained exactly as he was "immediately before trial commenced in Mississippi County in 1981." *Ford, supra.* Because Mr. Ford had already been granted one change of venue to Mississippi County, we held that the trial court did not abuse its discretion in denying Mr. Ford's request to have venue transferred back to Crittenden County. *Ford, supra.*

Mr. Dansby suggests that *Ford, supra,* is distinguishable from this case because his request to return venue to the county where the crime was committed was made before there was a trial and before there was a conviction. This distinction, however, ignores the focus of our holding in *Ford*. It is where venue stands immediately prior to trial that is controlling. In Mr. Ford's case, venue was in Mississippi County immediately before trial in 1991. In this case, venue was in Miller County immediately before trial in 1997.

Mr. Dansby, however, seeks to ignore the trial court's July 11, 1996 ruling that transferred venue to Miller County, by insisting that the only step taken to change venue was a docket entry. He submits, therefore, that his motion was not a request to change venue again, but rather that it was a request to withdraw his earlier motion for change of venue. This argument is not supported by the record of what transpired at the July 11, 1996 hearing. On

that date, the trial court moved the jury trial to Miller County, and, as reflected in the colloquy quoted above, both the trial court and the State endeavored to make sure that Mr. Dansby understood the significance of such a transfer. When Mr. Dansby's motion to withdraw was heard by the trial court at a hearing on March 19, 1997, the trial court had already coordinated the docket with three other judges in order to secure a courtroom on the scheduled trial date of April 7, 1997, and the State had already subpoenaed its witnesses to appear on that date in Miller County.

■ Under these circumstances, it is clear that the trial court complied with Article 2, § 10, of the Arkansas Constitution and Ark. Code Ann. § 16-88-203 (1987), when it acted upon Mr. Dansby's first request for a change of venue in July 1996 and transferred venue to Miller County. Although Mr. Dansby labeled his second motion as a motion to withdraw the earlier request for a change of venue, it was actually nothing more than a request for a second change of venue, and therefore was discretionary with the trial judge. *See Ford, supra; Ronning, supra; Perry, supra.* Furthermore, we cannot say that the trial court abused its discretion when it denied Mr. Dansby's request for a second change of venue.

Batson *Challenge*

Mr. Dansby's second point for reversal asserts that the trial court erred in overruling his *Batson* challenge to the State's exercise of one of its peremptory strikes on Mr. Christopher Conner, the first African-American drawn for consideration as a juror. Mr. Dansby contends that the basis for the State's challenge, Mr. Conner's opposition to the death penalty, was not race-neutral. This argument is without merit.

■ ■ We will reverse a trial court's ruling on a *Batson* challenge only when its findings are clearly against the preponderance of the evidence. *See Williams v. State,* 338 Ark. 97, 991 S.W.2d 565 (1999); *Green v. State,* 330 Ark. 458, 956 S.W.2d 849 (1997). In making *Batson* rulings, we accord a measure of deference to the trial court in light of its superior position to make such determinations due to its unique opportunity to observe the parties and determine their credibility. *Williams,* supra; *Sanford v.*

*State*, 331 Ark. 334, 962 S.W.2d 335 (1998). Unless discriminatory intent appears in the prosecutor's explanation, the reason given will be considered race-neutral. *Williams, supra.* We have previously held that the State could use a peremptory challenge to strike a juror who was morally opposed to the death penalty. *See Green, supra; Sanford, supra.*

The jury panel here was composed of sixty-four venire persons, with twelve members of the venire being African-American. Mr. Christopher Conner was the first African-American questioned during voir dire and the only African-American peremptorily challenged by the State. Mr. Conner's answers to questions by the trial court, the State, and the defense, indicated a moral opposition to the death penalty. He stated that he was "opposed to putting someone to death for any crime," and added that under no circumstances did he believe in capital punishment or the death penalty. While Mr. Conner ultimately conceded that he could follow the judge's instructions on the law and consider the death penalty if so instructed, he also admitted upon re-examination by the State that he could not vote to impose the death penalty on another individual. The State then moved to strike Mr. Conner. Defense counsel raised a *Batson* challenge and argued that Mr. Conner was being excluded by virtue of his race. The State responded that it was striking Mr. Conner because of his inability to consider or impose the death penalty even under direct instruction by the trial court.

The trial court initially ruled that no systematic pattern of discrimination had been demonstrated, but that it would continue to look for such a pattern. While the trial court refused to disallow the State's peremptory strike at that time, it instructed Mr. Conner to remain under summons as a juror until jury selection was completed. The trial court reiterated its willingness to reconsider the issue if a pattern were to develop later. Two African-Americans were ultimately seated on the jury.[2] We have previously observed that this is persuasive evidence of a lack of racial bias during jury selection. *See Sanford v. State*, 331 Ark. 334, 962

---

[2] Juror Mildred Sanders was later excused from service during the course of the trial pursuant to a note from her doctor.

S.W.2d 335 (1998). Additionally, the State peremptorily struck a white female from the venire on the same basis that it struck Mr. Conners — an inability to consider the death penalty. The trial court ultimately allowed the challenge, concluding that the State's race-neutral explanation for striking Mr. Conner was not a pretext for purposeful discrimination.

■ ■ Mr. Dansby maintains, however, that striking an African-American juror from the venire on the basis of that juror's views on the death penalty is equivalent to a violation of the United States Supreme Court's ruling in *Batson v. Kentucky*, 476 U.S. 79 (1986), because most African-Americans oppose the death penalty due to its unequal application. He also asks us to reconsider our holdings in *Green* and *Sanford*, arguing that the effect of these decisions is to justify a racially based peremptory strike. We have previously considered and rejected similar arguments of generalized death penalty views among the African-American population. *See Danzie v. State*, 326 Ark. 34, 930 S.W.2d 310 (1996). Mr. Dansby has provided neither the trial court nor this court with any evidence or data in support of this factual assertion. The United States Supreme Court has noted:

> "Death Qualification," unlike the wholesale exclusion of blacks, women, or Mexican-Americans from jury service, is carefully designed to serve the State's concededly legitimate interest in obtaining a single jury that can properly and impartially apply the law to the facts of the case at both the guilt and sentencing phases of a capital trial."

*Lockhart v. McCree*, 476 U.S. 162, 175-76 (1986). Thus, even if Mr. Dansby's factual suppositions were accurate, we would nonetheless affirm the trial court's ruling on the basis that the State has a legitimate interest in seating only those jurors who can follow the provisions of the law, including the imposition of the death penalty. *See, e.g., Danzie, supra*. We therefore affirm on this point.

*Motion to Suppress Expended .22 Cartridge Casings*

■ Mr. Dansby's third point on appeal is that the trial court erred in denying his motion to suppress the introduction of

the four expended .22 cartridge casings found by Sheriff Morman at his home because no written report was made of the seizure as required by Ark. R. Crim. P. 15.4. We affirm on this point as well.

Rule 15.4 of the Arkansas Rules of Criminal Procedure states:

> (a) In all cases of seizure other than pursuant to a search warrant, the officer making the seizure shall, as soon thereafter as reasonably possible, report in writing the fact and circumstances of the seizure, with a list of things to the court before which the defendant will be brought for first appearance, or, if no arrest is made to a court having jurisdiction to entertain proceedings respecting the offense disclosed by the seizure.

> (b) A copy of the list shall be given to the defendant or his counsel and the list shall be given such public notice as may be directed by a court of competent jurisdiction.

While we have never interpreted the substantive requirements of Rule 15.4, it is clear that we must analyze it in conjunction with our rules regarding the suppression of evidence. When reviewing a denial of a motion to suppress, this court must make an independent determination based upon the totality of the circumstances. *Green v. State*, 334 Ark. 484, 978 S.W.2d 300 (1998); *Thompson v. State*, 333 Ark. 92, 966 S.W.2d 901 (1998). We reverse only if the trial court's ruling was clearly against the preponderance of the evidence. *Green, supra; Thompson, supra.* In making this determination, we view the evidence in the light most favorable to the State. *Green, supra; Thompson, supra.*

■ Pursuant to Rule 16.2(e) of the Arkansas Rules of Criminal Procedure, a motion to suppress evidence based on a rule violation will "be granted only if the court finds that the violation upon which it is based was substantial." Rule 16.2(e) also enumerates the circumstances that a court must consider in determining whether a violation is substantial:

> (i) the importance of the particular interest violated;

> (ii) the extent of deviation from lawful conduct;

> (iii) the extent to which the violation was willful;

(iv) the extent to which privacy was invaded;

(v) the extent to which the exclusion will tend to prevent violations of these rules;

(vi) whether, but for the violation, such evidence would have been discovered;

(vii) the extent to which the violation prejudiced the moving party's ability to support his motion, or to defend himself in the proceedings in which such evidence is sought to be offered in evidence against him.

Consequently, a rule violation will warrant the suppression of evidence only when the trial court, after considering the factors set forth in Rule 16.2(e), finds that the violation was substantial. In *McFarland v. State*, 284 Ark. 533, 684 S.W.2d 233 (1985), we held that the failure to return a warrant to the issuing judicial officer as required by Ark. R. Crim. P. 13.4 was not a substantial violation sufficient to warrant suppression of the evidence where the failure was not willful and the appellants had shown no prejudice.

In this case, the testimony revealed the following: Deputy Kisselburg, Deputy Sorrells and Sheriff Morman all went to Mr. Dansby's residence on October 19, 1993 in order to obtain blood and handwriting samples pursuant to a seizure warrant. Once they arrived at the residence, Deputy Kisselburg went to the front door while Deputy Sorrells and Sheriff Morman went around to the back door and commenced knocking. Sheriff Morman and Deputy Sorrells both testified that the sheriff noticed a .22 shell casing lodged between two bricks at the back entrance. Sheriff Morman and the other officers then began looking around Mr. Dansby's residence for other shell casings while they waited for Mr. Dansby to return. Within twenty to thirty minutes of their arrival, Sheriff Morman discovered three more .22 shell casings in the back yard no more than twenty feet from where the first casing was found. None of the other officers found any shells. Although Deputy Sorrells witnessed the sheriff retrieve the first .22 shell casing from between the bricks at Mr. Dansby's back door, neither of the deputies witnessed the sheriff's discovery of the other three shell casings.

Sheriff Morman then gave the shell casings to Deputy Kisselburg, who transferred them to a .35 mm film canister. The container was then sealed with evidence tape and Sheriff Morman delivered it to Sgt. Ursery, who issued an evidence receipt dated October 19, 1993. According to Sheriff Morman, the sealed film canister was submitted to the State Crime Laboratory on February 8, 1994.

At the hearing on Mr. Dansby's motion to suppress the shell casings, Sheriff Morman and Deputy Kisselburg testified that a report about the discovery of the shells on October 19, 1993, was filed in the law enforcement file. Sheriff Morman was subsequently interviewed on June 7, 1996, by State Police Investigator Lt. Mike Fletcher about the circumstances of the seizure on October 19, 1993, and that interview was transcribed. Although the report mentioned by Sheriff Morman and Deputy Kisselburg was never produced, their testimony about its existence went unrebutted.[3] The State maintained an open-file policy throughout the discovery process, and the defense was made aware that these shells, discovered at Mr. Dansby's home on October 19, 1993, were part of the State's evidence.

In light of these circumstances, we conclude that there has not been a substantial violation of Rule 15.4 warranting suppression of the shells. There was consistent testimony by three law enforcement officials detailing the facts and circumstances of the search. There is a receipt documenting the transfer of the evidence from Sheriff Morman to the State Police Investigator that corroborates the date of the seizure and lists the items that were found. Finally, there was testimony that a report was filed in the law enforcement file. The trial court observed that the filing of the report in the law enforcement file was reasonable where no charges had been filed, no arrest had been made, and there was no case file where the court clerk could file such a report. Further-

---

[3] There was a reference to a report authored by Sheriff Morman in a motion filed by Mr. Dansby's first attorney. The trial court acknowledged that it could not be sure that it was a reference to an actual report made by Sheriff Morman or a reference to the June 7, 1996 interview conducted by Lt. Fletcher. Nonetheless, the trial court appeared to view the reference as evidence that a report by Sheriff Morman in fact existed and was at some point reviewed by Mr. Dansby's attorneys.

more, the materials in the law enforcement file became available to the defense through the State's open file policy. Based on this record, we cannot say that Sheriff Morman willfully failed to report the fact and circumstances of the seizure to the court "as soon thereafter as reasonable possible," as required by Rule 15.4.

Mr. Dansby also cites an inability to follow the "torturous" path of the shell casings as a circumstance indicating prejudice. However, the path that the shell casings followed after they left Sheriff Morman's possession does not bear upon the Rule 15.4 issue. The purpose of Rule 15.4 is to give the trial court notice of a warrantless seizure within a reasonable time after the seizure. Whereas, the path of evidence after seizure is governed by the establishment of a proper chain of custody. In any event, the path of the shell casings, which has been described earlier in this opinion, is traceable simply through the numerous reports from the various testing facilities and law enforcement agencies, and those reports were made available to Mr. Dansby during the course of discovery. Accordingly, we cannot say that Mr. Dansby has shown prejudice resulting from Sheriff Morman's failure to comply with Rule 15.4.

Based upon the totality of the circumstances, we conclude that the trial court's ruling was not against the preponderance of the evidence. We, therefore, affirm the trial court's ruling that the failure to report the seizure to the court as required by Ark. R. Crim. P. 15.4 was not a substantial violation sufficient to warrant suppression of the evidence.

### Motion To Suppress DNA Test Results

Mr. Dansby next argues that the trial court erred in overruling his objection to the introduction of the DNA test results on grounds that the State failed to establish a proper chain of custody for his blood samples. We have consistently agreed that the purpose of establishing a chain of custody is to prevent the introduction of evidence that is not authentic or that has been tampered with. *White, supra; Harris, supra.* However, while the trial court must be satisfied that, in reasonable probability, the evidence has not been tampered with, it is not necessary that the

State eliminate every possibility of tampering. *White, supra; Phills v. State,* 301 Ark. 265, 783 S.W.2d 348 (1990); *Lee, supra.*

Proof of the chain of custody for interchangeable items like blood must be more conclusive than for other items of evidence. *White, supra; Chrisco v. State,* 328 Ark. 388, 943 S.W.2d 582 (1997). However, the mere possibility of access to blood, where there is no evidence of tampering, is not enough to render test results from that blood inadmissable. *Lee v. State,* 326 Ark. 229, 931 S.W.2d 433 (1996); *Turner v. State,* 258 Ark. 425, 527 S.W.2d 580 (1975).

Mr. Dansby was taken to Dr. Young's office on October 19, 1993, where his blood was drawn by LPN Janice Nolan. Although Lt. Duvall testified that he thought Ms. Nolan only gave him two tubes of blood and so indicated on the evidence submission sheet that accompanied the blood sample to the laboratory, he acknowledged that he never actually counted the tubes and that he was going more on how many tubes he had been instructed to collect. On the other hand, Ms. Nolan testified unequivocally that she drew three tubes of blood from Mr. Dansby on October 19, 1993. She further testified that she dated and initialed each tube and placed the tubes in a plastic bag. She then sealed the bag with tape, initialed the tape herself, and then had Mr. Dansby initial the tape. Lt. Duvall delivered the bag to the State Crime Laboratory the next morning. The circumstances of Ms. Nolan's testimony are corroborated by the testimony of Mr. Channel at the State Crime Laboratory, who stated that he received a sealed bag on October 20, 1993, and that the seal bore the initials of both Ms. Nolan and Mr. Dansby. Mr. Channel also testified that the bag contained three tubes of blood with Mr. Dansby's name on each one of them and that all three tubes bore Ms. Nolan's initials. Mr. Channel testified that neither the bag nor the seal showed any evidence of tampering.

As noted above, we must evaluate the trial court's denial of Mr. Dansby's motion to suppress under the totality of the circumstances, and view the evidence in a light most favorable to the State. Green, supra. Any inconsistencies in the testimony are for the trier of fact to resolve. *Freeman v. State,* 331 Ark. 130, 959

S.W.2d 400 (1998). Evaluating the testimony under those princi-
ples, any inconsistency in the evidence as to the number of tubes
collected was logically and credibly resolved by the State's
witnesses.

██ ██ Similarly, an erroneous date on the third tube of
blood was also resolved by Ms. Nolan's testimony. Ms. Nolan
acknowledged on the witness stand that the October 9, 1993 date
on the third tube of blood must have been her mistake. She
explained that she must have omitted a "1" when dating the third
tube. Her explanation is made more convincing by her testimony
that, after going back and checking her records, she discovered
that October 9, 1993, was a Saturday. She testified that she was
not working on that date because Dr. Young's office was not open
on Saturdays, so it would have been impossible for her or anyone
in Dr. Young's office to have drawn blood on that date. Yet, the
third tube of blood bore her handwritten initials. Inconsistencies
in testimony are for the trier of fact to resolve. *Freeman v. State*,
331 Ark. 130, 959 S.W.2d 400 (1998). In view of the testimony
of Ms. Nolan and Mr. Channel indicating that three tubes of
blood were drawn from Mr. Dansby on October 19, 1993, and the
complete lack of evidence in the record reflecting any actual tam-
pering or contamination of the samples, or any significant gap in
the chain of custody, we cannot say that the trial court abused its
discretion in admitting the results of the DNA testing.

### Husband-Wife Privilege

Mr. Dansby's fifth point on appeal asserts that the trial court
erred in finding that the husband-wife privilege had been waived
and allowing his wife, Mrs. Betty Dansby, to testify against him.
The State asserts that this privilege was effectively waived because
a third party testified that Mr. Dansby communicated the privi-
leged matter to him. We agree and affirm on this point also.

██ Rule 504 of the Arkansas Rules of Evidence provides
that "[a]n accused in a criminal proceeding has a privilege to pre-
vent his spouse from testifying as to any confidential communica-
tion between the accused and the spouse." *See also*, Ark. Code
Ann. § 16-41-101 (1987). However, Ark. R. Evid. 510 states:

> A person upon whom these rules confer a privilege against dis-
> closure waives the privilege if he or his predecessor while holder
> of the privilege voluntarily discloses or consents to disclosure of
> any significant part of the privileged matter. This rule does not
> apply if the disclosure itself was privileged.

Thus, if the same information protected by privilege is disclosed
to a third person, the privilege is waived. *See, e.g., Halfacre v.
State*, 292 Ark. 331, 731 S.W.2d 179 (1987).

In this case, the State called Mr. Dansby's wife, Betty
Dansby, to testify in its case-in-chief. Mr. Dansby asserted the
husband-wife privilege and the trial court ruled prior to her testi-
mony that the husband-wife privilege applied and warned Mrs.
Dansby not to disclose any confidential communications between
her and Mr. Dansby. She then testified only about what she had
observed.

Later in its case-in-chief, the State presented the testimony of
Mr. Jackie Cooper. According to Mr. Cooper, he and Mr.
Dansby were both being held at the Nevada County jail when Mr.
Dansby told him that he committed the murders. Specifically,
Mr. Cooper testified that Mr. Dansby told him that he killed the
two victims, killing the male victim first; that he raped the female
victim; that he undressed the female victim after he killed her in
order to prevent the discovery of hairs or fibers; that he attempted
to wipe the female's vaginal area clean after the rape; and that he
killed one of the victims in a location different from the one
where the bodies were found.

Mr. Dansby then took the stand in his own defense and
denied that he told Mr. Cooper that he had killed the victims or
that he had raped the female victim. Prior to cross-examination
by the State, the trial court ruled that Mr. Dansby had waived the
spousal privilege because a third party had testified that Mr.
Dansby confessed to him about the murders. The State then was
allowed to ask Mr. Dansby about the statements he made to his
wife, whereupon Mr. Dansby denied ever telling his wife that he
killed the victims. Mrs. Dansby was then called as a rebuttal wit-
ness for the State. She testified that Mr. Dansby told her that he
killed the victims because a white man had killed his grandpa and

nothing was done about it, that he threw the gun in a gravel pit, and that, if she loved him, she wouldn't tell anyone what he had told her.

Mr. Dansby argues that the trial court should have decided that Mr. Cooper's "highly disputed" testimony lacked credibility and ruled that Mr. Dansby had not waived the husband–wife privilege. To that end, Mr. Dansby points out that Mr. Cooper had been in the penitentiary on seven different occasions, all for violent crimes; that he and Mr. Dansby were not cell mates; that they had never met prior to their coincidental incarceration at the Nevada County jail; and that Mr. Cooper had previously told police that another inmate had confessed to the murders.

Mr. Dansby also suggests that the waiver of the husband–wife privilege should be limited to situations where the privileged matter is disclosed by the defendant to numerous people, either directly or by being overheard. We have previously upheld the waiver of the husband–wife privilege under such circumstances. *Perry v. State*, 280 Ark. 36, 655 S.W.2d 380(1983); *Sumlin v. State*, 273 Ark. 185, 617 S.W.2d 372 (1981). Finally, he suggests that the waiver should be limited to communications with a third party that are undisputed, because the defendant in *Halfacre, supra*, did not dispute the disclosure. Mr. Dansby thus proposes that his denial of the disclosure to Mr. Cooper should foreclose a waiver of the husband–wife privilege.

Unfortunately Mr. Dansby's arguments are not supported by Rule 510 of the Arkansas Rules of Evidence which plainly states that the communication of any significant part of the privileged matter to someone other than the spouse waives the spousal privilege. The rule grants no exceptions or qualifications other than when the disclosure is itself privileged, such as a disclosure covered by lawyer–client privilege. Rule 510 does not state that the waiver depends upon the disclosure being heard by a number of people. Nor does the rule state that the waiver depends upon the third party's testimony being undisputed. While we sympathize with Mr. Dansby on the quality of the State's witness, the fact remains that the State introduced evidence that the privileged communication was disclosed to someone

other than Mr. Dansby's wife. In other words, the State introduced evidence that there had been a waiver of the privilege. Under such circumstances, it is solely within the province of the jury, not the trial court, to determine the credibility of that witness and the weight to be afforded that evidence. In that regard, Mr. Cooper was cross-examined extensively by Mr. Dansby's counsel.

### Mr. Dansby's Admission

Mr. Dansby's final point on appeal is that the trial court erred in allowing the State to cross-examine him about statements he made during an *in camera* hearing. He contends that the trial court allowed impeachment by extrinsic evidence on a collateral matter. The State asserts that the testimony was admissible because it reflected on Mr. Dansby's credibility. We agree and affirm on this point.

In his final point, Mr. Dansby contests an evidentiary ruling by the trial court. A trial court is accorded wide discretion in evidentiary rulings, and will not be reversed on such rulings absent a manifest abuse of discretion. *Skiver v. State,* 336 Ark. 86, 983 S.W.2d 931 (1999); *Miskelley v. State,* 323 Ark. 449, 915 S.W.2d 702 (1996).

During an *in camera* hearing concerning the admissibility of certain items left at Mr. Dansby's home after he vacated the premises, the following exchange occurred:

MR. DANSBY: Could you rephrase the question please?

MR. ROGERS (*For the State*): Is any of these what's been termed pornographic magazines yours?

MR. DANSBY: If it's something that's going to hurt me, I say no.

MR. ROGERS: Sir?

MR. DANSBY: If it's something that's going to be used to hurt me, I say no.

MR. ROGERS: You're going to lie if you think it's going to hurt you?

MR. DANSBY: Because it has nothing to do with whatever you are talking about. They were taken from some place property, shouldn't have taken them from my property.

The State then announced its intention to cross-examine Mr. Dansby in front of the jury concerning his statements that he would lie if a truthful answer would hurt him. The trial court ruled that, although the pornographic magazines were not admissible under the Ark. R. Evid. 403 balancing test, the State could question Mr. Dansby about the above-quoted statement that he made during the *in camera* hearing because it was relevant to his credibility. The trial court further instructed the State to refrain from mentioning the pornographic magazines in its cross-examination. When the jury returned to the courtroom, Mr. Dansby testified as follows in response to the State's questions:

MR. ROGERS (*For the State*): Okay, Mr. Dansby, during the break, I believe I asked you if you could identify some items?

MR. DANSBY: Yes.

MR. ROGERS: And did you recall making the response if it's something that hurts me, I say no?

MR. DANSBY: Yes, I said that.

MR. ROGERS: And then you responded again, if it's something that's going to be used to hurt me, I say no.

MR. DANSBY: Yes, I said that.

 A witness's credibility is always an issue, subject to attack from any party. *See* Ark. R. Evid. 607. Mr. Dansby took the stand and thereby made his credibility an issue. He now argues that the State should not have been allowed to ask him about a statement he made in an *in camera* hearing while answering questions about a collateral matter, *i.e.*, his possession of pornographic magazines in his home. We have previously held that a matter is not collateral if the cross-examining party would be entitled to prove the issue as a part of the case-in-chief, or if the evidence is relevant to show bias, knowledge, intent, or interest. *Arthur v. Zearley*, 337 Ark. 125, 992 S.W.2d 67 (1999); *Pyle v. State*, 314 Ark. 165, 862 S.W.2d 833 (1993). Mr. Dansby testified under oath that if he was asked about "something that's going to

be used to hurt me, I say no." This admission that made no reference to the evidence excluded by the trial court (the pornographic magazines) was relevant to show Mr. Dansby's bias. Mr. Dansby's statement indicated a willingness to give false testimony if it would help his case. Such a propensity can only be characterized as a bias that is governed by the principle of utilitarianism — testimony that would benefit Mr. Dansby would prevail over the truth. Mr. Dansby's admission during the *in camera* hearing was simply not a collateral matter. We, therefore, cannot say that the trial court's evidentiary ruling was an abuse of discretion.

*Ark. Sup. Ct. R. 4-3(h) Compliance*

In accordance with Rule 4–3(h), the record has been reviewed for adverse rulings objected to by Mr. Dansby but not argued on appeal, and no reversible errors were found.

Affirmed.