Billy Dale GREEN *v.* STATE of Arkansas

CR 04-1379                                                231 S.W.3d 638

Supreme Court of Arkansas
Opinion delivered March 9, 2006

[Rehearing denied April 20, 2006.*]

---

* GLAZE, DICKEY, and GUNTER, JJ., would grant rehearing.

*Arkansas Public Defender Commission*, by: *Janice Vaughn*, for appellant.

*Mike Beebe*, Att'y Gen., by: *Laura Shue*, Ass't Att'y Gen., for appellee.

DONALD L. CORBIN, Justice. Appellant Billy Dale Green appeals the judgment and order of the Randolph County Circuit Court convicting him of four counts of capital murder and one count of kidnapping. Appellant was sentenced to death on each count of capital murder and to life imprisonment on the count of kidnapping. On appeal, Appellant raises seven arguments for reversal: (1) the trial court erred in denying Appellant's motion for a directed verdict; (2) the State violated Appellant's constitutional right to due process by failing to disclose impeachment evidence; (3) the trial court erred by allowing Mary Green to testify against Appellant over his assertion of the marital privilege; (4) the trial court erred by allowing the State to present reputation and other bad acts evidence; (5) the trial court erred in allowing the hearsay testimony of the victims, and in so doing, violated Appellant's right to confrontation; (6) the trial court abused its discretion in allowing Kermit Channel's testimony; (7) the trial court erred by failing to grant a mistrial, based upon the State's improper remarks during closing argument. As this case in-

volves a sentence of death, our jurisdiction is proper pursuant to Ark. Sup. Ct. R. 1-2(a)(2). We find that the trial court committed reversible error in allowing the State to present reputation and other bad acts evidence, and remand the case for a new trial.

On July 30, 1998, Lisa Elliott and her six-year-old son, Gregory, were found dead at their home in Dalton, Arkansas. Both had been killed by multiple sharp-force and blunt-force injuries. At that time, Lisa's husband, Carl Elliott, and their eight-year-old daughter, Felicia, were missing. On August 1, 1998, Carl's body was found floating in the Eleven Point River. An autopsy ruled his death a homicide, as a result of two .22 caliber gunshot wounds to the head, with cutting wounds to his neck. Shortly after Carl's body was found, Chad and Jason Green, Appellant's sons, became suspects in the murders. Felicia's remains were found two years later, on September 7, 2000, on Mud Creek in the Warm Springs area about a half a mile from Appellant's home at the time. After Felicia's remains were found, Appellant also became a suspect because of the close proximity of the remains to his home.

In July 2003, Appellant and Chad were arrested on an unrelated matter. On July 29, 2003, a confidential informant, later identified as Mary Green, went to the police and gave a statement. She reported that on the evening of July 29, 1998, Appellant received a call from Chad, left the house, and was gone for several hours before returning. She also told police that about two years after the murders, Appellant told her that he had met Chad to help him clean up the murders. She also stated that on more than one occasion Appellant told her that Chad had committed the murders, but that Chad had told her on more than one occasion that Appellant committed the murders.

On August 3, 2003, Appellant was charged with four counts of capital murder for the Elliott murders and one count of kidnapping.[1] On August 9, 2003, Chad gave a statement to the police implicating his father in the murders. For testifying at Appellant's trial, Chad received a deal, where he would be sentenced to twenty years for the murders, to run consecutively with twenty years for the kidnapping of Felicia.

At trial, Chad testified that, on the evening of July 29, 1998, Carl Elliott came to his house. Chad then called Appellant, as

---

[1] Appellant was also charged with one count of intimidating a witness but that charge was subsequently dropped.

Appellant had instructed him to if Carl ever came by. Appellant went to Chad's house, but Carl had left by the time he arrived. Appellant and Chad smoked methamphetamine, and Appellant drank the remainder after he had dumped it into some coffee. As they were leaving Chad's house, Appellant told Chad to grab his .22 rifle and they went for a ride to Dalton. Pursuant to Appellant's instructions, Chad went to the Elliott home, told Carl he was having car trouble, and had Carl drive him down to the river. Chad testified that when they got to where Appellant was waiting, Appellant started beating Carl and asking "where's my stuff?" Carl told Appellant that only his daughter knew where it was, to which Appellant replied, "I told you I'd kill you." Appellant then shot Carl, and as Chad was turning away he heard another shot. Next, Chad heard Appellant say that he never had a knife when he needed one. He then told Chad to "[t]ake the car and go back up to the house."

When they got up to the Elliott house, Appellant went in. Chad heard yelling, got out of the car, and saw Appellant hitting Lisa with a bar or something. Chad testified that Appellant told him to get back in the car, and when he turned around he saw blood and noticed a little boy's body lying on the floor. Then, Appellant came out of the house with Felicia wrapped in a blanket and put her in the trunk of the Elliott's car. Chad testified that he could see "just legs and she was moving around." Appellant told Chad to drive back to the river, where Appellant taped Felicia's legs, mouth, and hands before putting her in the bed of his truck. They drove to Chad's house where Appellant put Felicia in the shed, in a trash can, with the gun and his coat. The next day, Appellant bought diesel fuel which he and Chad used to burn the gun and clothes. Appellant then removed Felicia from the shed and drove with Chad towards the Green family home. Appellant took Felicia into a wooded area, and returned to the truck without her. Appellant told Chad to burn the blanket and the tape.

In addition to Chad's testimony, other members of the Green family testified that Appellant and Chad were not home on the night of the Elliott murders, but that Appellant had told them, if they were ever asked, to say that everyone was home. Willie Scott Moffitt also testified that, while he was in the Craighead County Jail with Appellant, Appellant made several remarks regarding the murders and that "[w]e just shouldn't have done it."

The jury convicted Appellant as set forth above, and this appeal followed.

## I. Sufficiency of the Evidence

First, Appellant argues that the trial court erred in denying his motion for a directed verdict. Specifically, Appellant claims that a close reading of the testimony presented by the State reveals that the only direct evidence linking Appellant to the Elliott murders came from Chad Green, an accomplice. Appellant points out that Chad's testimony must be corroborated by other evidence sufficient enough to connect Appellant to the crimes; however, Appellant maintains that the only other possible corroborating evidence came from a "jailhouse snitch" Scott Moffitt. Appellant claims that this court must examine Moffitt's testimony in a manner similar to how we review accomplice testimony, such that Moffitt's testimony must be substantial enough, standing alone, to independently prove Appellant's connection to the murders. The record reflects that the only arguments Appellant raised in connection with his motion for a directed verdict on both the capital-murder charges and the kidnapping charge centered on the sufficiency of the evidence and whether the State met its burden with corroborating the accomplice testimony. Appellant did not make an argument that the court should adopt a new standard and require corroboration for testimony of a "jailhouse snitch."

This court has repeatedly held that appellants are precluded from raising arguments on appeal that were not first brought to the attention of the trial court. *See, e.g., Flanery v. State*, 362 Ark. 311, 208 S.W.3d 187 (2005); *Phillips v. State*, 361 Ark. 1, 203 S.W.3d 630 (2005); *Marta v. State*, 336 Ark. 67, 983 S.W.2d 924 (1999). Issues raised for the first time on appeal will not be considered because the trial court never had an opportunity to rule on them. *London v. State*, 354 Ark. 313, 125 S.W.3d 813 (2003). Thus, because Appellant did not argue below that the testimony of a "jailhouse snitch" needs to be examined under a standard similar to that used for corroborating accomplice testimony, it cannot be raised on appeal.

We now turn to that part of Appellant's argument that was preserved for our review. It is well settled that we treat a motion for a directed verdict as a challenge to the sufficiency of the evidence. *Gardner v. State*, 364 Ark. 506, 221 S.W.3d 339 (2006); *Jones v. State*, 357 Ark. 545, 182 S.W.3d 485 (2004). The test for determining the sufficiency of the evidence is whether the verdict is supported by substantial evidence, direct or circumstantial. *Id.* Evidence is substantial if it is of sufficient force and character to compel reasonable minds to reach a conclusion and pass beyond

suspicion and conjecture. *Id.* On appeal, we view the evidence in the light most favorable to the State, considering only that evidence that supports the verdict. *Id.* The requirement that a defendant make a specific directed-verdict motion extends to any challenge to the sufficiency of the evidence corroborating an accomplice's testimony. *Gardner,* 364 Ark. 506, 221 S.W.3d 339; *Tillman v. State,* 364 Ark. 143, 217 S.W.3d 773 (2005).

As stated earlier, Appellant was convicted of capital murder and kidnapping. Ark. Code Ann. § 5-10-101(a)(4) (Supp. 2005) states, in relevant part:

> (a) A person commits capital murder if:
>
> . . . .
>
> (4) With the premeditated and deliberated purpose of causing the death of another person, he or she causes the death of any person[.]

Ark. Code Ann. § 5-11-102(a)(4) (Repl. 1997) states, in relevant part:

> (a) A person commits the offense of kidnapping if, without consent, he restrains another person so as to interfere substantially with his liberty with the purpose of:
>
> . . . .
>
> (4) Inflicting physical injury upon him, or of engaging in sexual intercourse, deviate sexual activity, or sexual contact with him[.]

When accomplice testimony is considered in reaching a verdict, Ark. Code Ann. § 16-89-111(e)(1) (Supp. 2005) provides:

> (A) A conviction . . . cannot be had in any case of felony upon the testimony of an accomplice . . . unless corroborated by other evidence tending to connect the defendant . . . with the commission of the offense.
>
> (B) The corroboration is not sufficient if it merely shows that the offense was committed and the circumstances thereof.

Corroboration is not sufficient if it merely establishes that the offense was committed and the circumstances thereof. *Gardner,* 364 Ark. 506,

221 S.W.3d 339; *Martin v. State*, 346 Ark. 198, 57 S.W.3d 136 (2001). It must be evidence of a substantive nature since it must be directed toward proving the connection of the accused with a crime and not directed toward corroborating the accomplice testimony. *Id.* The corroborating evidence need not be sufficient standing alone to sustain the conviction, but it must, independent from that of the accomplice, tend to connect to a substantial degree the accused with the commission of the crime. *Gardner*, 364 Ark. 506, 221 S.W.3d 339; *Rhodes v. State*, 276 Ark. 203, 634 S.W.2d 107 (1982). The test is whether, if the testimony of the accomplice were completely eliminated from the case, the other evidence independently establishes the crime and tends to connect the accused with its commission. *Gardner*, 364 Ark. 506, 221 S.W.3d 339; *Marta*, 336 Ark. 67, 983 S.W.2d 924. The corroborating evidence may be circumstantial so long as it is substantial; evidence that merely raises a suspicion of guilt is insufficient to corroborate an accomplice's testimony. *Gordon v. State*, 326 Ark. 90, 931 S.W.2d 91 (1996). With this standard in mind, we now look to the present case.

Here, after eliminating the accomplice testimony of Chad, there is sufficient evidence to support Appellant's convictions.[2] Specifically, other testimony and evidence, when viewed in the light most favorable to the State, established the crimes and Appellant's connection to them. First, evidence was presented that established that the Elliotts' deaths were homicides. Rob Samons, the Randolph County Sheriff,[3] testified that on July 30, 1998, he was dispatched to 246 Township Road, Dalton, Arkansas, in response to a report that someone had found their daughter dead on their front porch. Upon arriving, Samons found the body of Gregory Elliott inside the Elliotts' home, and Lisa Elliott on the front porch of a nearby mobile home. Steve Huddleston, an Arkansas State Police Investigator, testified that he was the leader of the investigation team that found a tire tool with blood on it in the Elliotts' children's room. Dr. Frank Peretti, an associate medical examiner at the Arkansas State Crime Laboratory, testified

---

[2] Appellant challenges the admissibility of various testimony. Despite his challenges, this court may still consider the testimony in reviewing the sufficiency of the evidence. *See Sanford v. State*, 331 Ark. 334, 962 S.W.2d 335 (1998) (holding that we consider evidence both properly and improperly admitted).

[3] Samons is currently employed by the Arkansas Highway Police, but was the sheriff at the time the murders occurred.

that the autopsies of Gregory and Lisa revealed that the deaths were homicides, caused by multiple blunt-force and sharp-force injuries. Furthermore, he stated that some of the wounds could have been caused by the tire tool. Second, Samons testified that on August 1, 1998, deputies found Carl Elliott's body floating in the river. Dr. Peretti ruled Carl's death a homicide, resulting from two gunshot wounds to the head with cutting wounds on the neck. Third, Samons testified that on September 7, 2000, Felicia Elliott's remains were found on Mud Creek in the Warm Springs area about a half a mile from where Appellant lived. Felicia's bones were scattered throughout the area, and Dr. Peretti ruled her death a homicide by unspecified means. Furthermore, Kermit Channel, a forensic biologist with the Arkansas State Crime Laboratory, testified that DNA found in the trunk of the Elliotts' car was Felicia's. This testimony clearly establishes the crimes.

Further evidence specifically links Appellant to the commission of these crimes. Members of the Green family testified that on July 29, 1998, Appellant received a phone call from Chad and, shortly thereafter, left to go help Chad clean up a mess. Mary Green also testified that the next day Appellant had her go check on Chad at his house, and when she reported that he was not there, Appellant told her that if she was asked, to say that Appellant was home all night and that Chad was too sick to come to work. Jason Green testified that Appellant told him that, if he was asked, to say that everyone was at the house on July 29, including him and Chad. Joshua Green testified that on the night of the murders Chad was not at home and that his father left to go help Chad after the phone call came in. Additionally, Jamie Green, Appellant's nephew, testified that in 1998, while he was at work, Appellant approached him and told him that if he ever said anything about the Elliotts, he would get hurt. This evidence connects Appellant to the crimes and sufficiently corroborates Chad's testimony.

In addition to testimony from the Green family, the State presented testimony from the Elliotts' relatives. Kathy Elliott Hart testified that, prior to the murders, she had a conversation with Carl and reminded him that he had stolen ten marijuana plants from Appellant. She further testified that she had discussed with Carl the fact that he had confessed the theft to Appellant. John Hart, Kathy's husband, also testified that he had discussed the theft and confession with Carl in the weeks preceding the murders.

Furthermore, Dewayne Crommie testified that two months before the murders, Lisa approached him and asked to borrow

$10,000.00 for Carl's bad debt to the Greens.[4] Also, Melvin Cox testified that two days before the murders he was coming out of a store and saw a group of people having an argument. He stated:

> I was coming out of Price Chopper after getting groceries and then there was a group of people right there by the front doors and they were having a argument and it was getting pretty heated up and one of the Green boys had the, the little boy by the hand and I heard something about them saying, "Where's your husband at?" And I started to walk on by but I couldn't get on through and then I asked Ms. Elliott if, you know, if she needed any help and they told me to keep my mouth shut, well, basically keep my fucking mouth shut.
>
> . . . .
>
> . . . they got in my face and then all of a sudden the Green father came out of the parking lot and told them, "This ain't the place to be doing this," and to get their asses in the car[.]

This evidence demonstrated that Appellant was angry with Carl because of the theft of his marijuana plants, thereby establishing a motive for the crimes. Moreover, while the State is not required to present evidence of motive, this evidence tends to connect Appellant to the crimes.

Lastly, Scott Moffitt testified that he was cell mates with Appellant in the Craighead County Jail.[5] Moffitt stated that he and Appellant got to talking about a murder case involving a vehicle and that Appellant told him that he had been arrested for four counts of murder. Moffitt testified that Appellant told him he did not think the police could get anything out of an impounded car because "they cleaned it out so good." Moffitt also stated that they got to talking about guns, and Appellant told him that " '[w]e used a .22 long rifle, that's what we used.' " Moffitt also testified that Appellant told him the police would never find the gun because they were looking in the wrong spot. Additionally, Moffitt testified that Appellant told him about the little girl and that her bones were scattered out over an area. Appellant told Moffitt " '[w]e just shouldn't have done it.' " Moffitt further testified that Appellant

---

[4] Randy Barber, a Randolph County Sheriff Deputy, testified that in Randolph County, healthy, mature marijuana plants are valued at about $1,000.00.

[5] The State did not offer Moffitt leniency in exchange for his testimony.

told him that he burnt their clothes because of DNA and that he killed the family over drugs. Moffitt explained that Appellant made a pistol-shaped gesture with his right hand and said, " 'If you don't pay the dope man, your ass is took down.' "

Upon review, the testimony presented at trial, without the use of the accomplice testimony, establishes that the crimes were committed and connects Appellant to those crimes. Consequently, the trial court did not err in denying Appellant's motion for a directed verdict.

## II. *Failure to Disclose Impeachment Evidence*

For his second argument on appeal, Appellant argues that the State violated his constitutional right to due process for its failure to disclose impeachment evidence regarding informant agreements pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Specifically, Appellant maintains that the State failed to disclose documentation concerning Moffitt's negotiations for a plea bargain that could have been used for impeachment purposes and that the State's actions deprived the jurors of a full opportunity to evaluate the credibility of his testimony. A review of the record indicates that this argument was not raised below.

Prior to trial, Appellant filed multiple motions related to discovery. Specifically, Appellant filed a motion for disclosure and discovery, a motion for inspection concerning informants and disclosure of exculpatory evidence, and a motion to require the State "to reveal information about any prosecution witness that could conceivably influence his testimony." On January 16, 2004, the trial court denied the latter motion, but advised the State that if "there is a plea negotiation or if you make some kind of a, quote, deal, unquote, with another witness that's not charged in exchange for his testimony, you're to reveal that to me and opposing counsel." In regards to the other two motions, Appellant and the State agreed to exchange the information in writing.

In April of 2004, the State filed responses disclosing that Moffitt had a recent felony drug conviction in Craighead County, other past convictions, and that he was currently on parole. After this disclosure, Appellant never raised an argument to the trial court that any discovery violations occurred. As previously stated, this court cannot review issues not raised before the trial court. *See, e.g., Flanery*, 362 Ark. 311, 208 S.W.3d 187; *Phillips*, 361 Ark. 1,

203 S.W.3d 630; *Marta,* 336 Ark. 67, 983 S.W.2d 924. Consequently, Appellant's second argument is not preserved for appeal, and we will not address it.

### III. Marital Privilege

For his third argument, Appellant claims that the trial court erred in allowing Mary Green to testify against him over his assertion of the marital privilege, and over his numerous objections. Ark. R. Evid. 504 provides, in part:

> (a) *Definition.* A communication is confidential if it is made privately by any person to his or her spouse and is not intended for disclosure to any other person.

> (b) *General Rule of Privilege.* An accused in a criminal proceeding has a privilege to prevent his spouse from testifying as to any confidential communication between the accused and the spouse.

Under this rule, statements made by one spouse to the other that are for the purpose of establishing an alibi are intended for publication to investigators and are not confidential. *Ridling v. State,* 360 Ark. 424, 203 S.W.3d 63 (2005); *Findley v. State,* 307 Ark. 53, 818 S.W.2d 242 (1991). Furthermore, a spouse's direction to another spouse to communicate a fabricated story to the police is intended for disclosure to a third party and is not a privileged communication subject to the protections of Rule 504. *Ridling,* 360 Ark. 424, 203 S.W.3d 63. Moreover, Ark. R. Evid. 510 provides:

> A person upon whom these rules confer a privilege against disclosure waives the privilege if he or his predecessor while holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the privileged matter. This rule does not apply if the disclosure itself is privileged.

Therefore, if the same information protected by privilege is disclosed to a third person, the privilege is waived. *Barrett v. State,* 354 Ark. 187, 119 S.W.3d 485 (2003); *Dansby v. State,* 338 Ark. 697, 1 S.W.3d 403 (1999). With this standard in mind, we now look to the present case.

Here, Appellant does not specifically point out which of Mary's statements he claims were improperly admitted, but rather refers the court to a section of Mary's testimony within the record.

In its response to Appellant's argument, the State pulls out four statements made by Mary that it feels Appellant is challenging. Mary testified that (1) while Appellant was on the phone with Chad, he said he would be there in a minute; (2) as Appellant was about to leave, he said he was going to go help Chad clean up a mess; (3) Appellant said he was going to Chad's home; and (4) the next morning, Appellant asked her about Chad's whereabouts, and then said that if she was asked, to say that Appellant "was home all night" and that Chad said "he was too sick to come to work."

■ Upon review, it is clear that the trial court did not abuse its discretion by overruling Appellant's objection to the above statements. First, statement one was made by Appellant to Chad while Appellant was speaking to Chad on the phone. The statement was not made to Mary and, therefore, does not fall within any marital communication privilege. In regards to statements two and three, the State presented evidence that other Green family members heard Appellant say that he had to go help Chad. Because these statements were not confidential, they do not constitute protected communications. Lastly, statement four was an attempt to have Mary fabricate a story as to Appellant's and Chad's whereabouts. Specifically, Appellant told Mary to state those things if she was questioned about their whereabouts. Because Appellant's statements were intended for Mary to establish an alibi, they were not privileged. Because none of the statements fell within the marital communication privilege, the trial court did not err in allowing Mary to testify about those statements.

### IV. Reputation and Other Bad Acts Evidence

For his fourth argument on appeal, Appellant claims that the trial court erred by allowing the State to present reputation and other bad acts evidence. Specifically, Appellant argues that the testimony of six witnesses, who were allowed to testify over his objections, was highly prejudicial, thus mandating a new trial. The State contends that Appellant failed to preserve these specific arguments on appeal. We disagree as the record reveals that Appellant did object to the introduction of some of this testimony throughout the trial.

Nevertheless, the issue of whether these arguments were preserved has no bearing on this case. At the outset, we note that, as this is a death-penalty case, we are bound by Ark. R. App. P.–

Crim. 10. As we explained in *Newman v. State*, 353 Ark. 258, 276, 106 S.W.3d 438, 450 (2003),

> Arkansas Rule of Appellate Procedure–Criminal 10 provides, in pertinent part, that the Arkansas Supreme Court shall consider the following issues in conducting its mandatory review of death sentences imposed on or after August 1, 2001:

> (b) *Mandatory review.* Whenever a sentence of death is imposed, the Supreme Court shall review the following issues in addition to other issues, if any, that a defendant may enumerate on appeal. . . . The Court shall consider and determine:

> . . . .

> (iv) whether the trial court failed in its obligation to intervene without objection to correct a serious error by admonition or declaring a mistrial;

> (v) whether the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant;

> . . . .

> Ark. R. App. P.–Crim. 10(b) (2002).

As required by Ark. R. App. P.–Crim. 10(b), we have reviewed all of the testimony, including those statements not objected to at trial. Our review reveals that the trial court committed serious error when it permitted the State to introduce the following testimony, pursuant to Ark. R. Evid. 404(b).

Rule 404 provides, in part:

> (a) *Character Evidence Generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

> (1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by prosecution to rebut the same;

> . . . .

> (b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in

order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Rule 404(b) "permits introduction of testimony of other criminal activity if it is independently relevant to the main issue, that is, relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal." *Spencer v. State*, 348 Ark. 230, 236, 72 S.W.3d 461, 464 (2002). The State is entitled to produce evidence showing circumstances which explain the act, show a motive for the killing, or illustrate the accused's state of mind. *Barrett v. State*, 354 Ark. 187, 119 S.W.3d 485 (2003). Consequently, "if the evidence of another crime, wrong, or act is relevant to show that the offense of which the appellant is accused actually occurred and is not introduced merely to prove bad character, it will not be excluded." *Anderson v. State*, 357 Ark. 180, 198, 163 S.W.3d 333, 342 (2004) (quoting *Smith v. State*, 351 Ark. 468, 473, 95 S.W.3d 801, 804 (2003)).

However, even if evidence is relevant pursuant to Rule 404(b), Ark. R. Evid. 403 provides that "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." The State is not entitled to introduce evidence of other offenses to persuade the jury that the accused is a criminal and likely to commit the crimes he has been charged with. *Hickey v. State*, 263 Ark. 809, 569 S.W.2d 64 (1978). Specifically, "proof of other crimes is never admitted when its only relevancy is to show that the prisoner is a man of bad character, addicted to crime." *Id.* at 810-811, 569 S.W.2d at 65 (quoting *Alford v. State*, 223 Ark. 330, 333, 266 S.W.2d 804, 806 (1954)). In dealing with issues relating to the admission of evidence pursuant to Rule 404(b), a trial court's ruling is entitled to great weight and this court will not reverse absent an abuse of discretion. *Anderson*, 357 Ark. 180, 163 S.W.3d 333; *Barnes v. State*, 346 Ark. 91, 55 S.W.3d 271 (2001). With this standard in mind, we now look at the following testimony.

### A. Kathy Elliott Hart

The first testimony Appellant claims was improperly allowed is Kathy Elliott Hart's. Kathy testified that her brother, Carl, and her nephew, Shane Martin, stole Appellant's marijuana plants.

Kathy also testified that she was afraid for her brother to be around the Greens because her nephew had died mysteriously after the theft. Appellant immediately objected to this statement and moved for a mistrial. The trial court overruled the mistrial motion, but offered a limiting instruction. Appellant accepted the offer, but a limiting instruction was not given at that time. Kathy further testified that she did not want her brother around the Greens because she knew Carl was involved with stealing Appellant's marijuana plants. After further testimony and an objection on a hearsay issue, Appellant renewed his objection to the testimony about Martin's death and also renewed his motion for mistrial. The trial court again asked if Appellant wanted a limiting instruction, but this time he responded, "I don't know yet."

The court again revisited this issue after the testimony of John Hart. At that time, the trial court offered a limiting instruction that "there's been absolutely nothing to prove" a link between Appellant and Martin's disappearance, and that "it was only elicited for the fact to show fear on behalf of Mrs. Hart." Appellant declined the offer on the basis that he feared it would be more prejudicial.

Upon reviewing this testimony, it is clear that the trial court abused its discretion in admitting Mrs. Hart's testimony. First, Mrs. Hart's statement was clearly prejudicial and alluded to her belief that Appellant played a role in Martin's murder and disappearance. Second, no admonition could have cured this statement, even if the trial court had intervened and attempted to curb the statement's effect on the jury. This statement was not only prejudicial but also irrelevant to the issue of whether Appellant committed the Elliott murders. In fact, it was nothing more than an attempt to prove that Appellant was a bad person.

A mistrial is a drastic remedy to be used only when an error is so prejudicial that justice cannot be served by continuing the trial and when the prejudicial statement cannot be cured by an instruction. *Jones v. State*, 340 Ark. 390, 10 S.W.3d 449 (2000). The trial court has the sound discretion to decide whether to grant a mistrial, and this decision will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Id.* Additionally, even if a remark is improper, the trial court may deny the mistrial motion and cure any prejudice by issuing a jury admonishment to disregard the remark. *Smith*, 351 Ark. 468, 95 S.W.3d 801; *Dandridge v. State*, 292 Ark. 40, 727 S.W.2d 851 (1987). Moreover, "where the possible prejudice could have been

cured by admonition by the trial court, this court has found no abuse of discretion when defense counsel has refused the trial court's offer of such a curative instruction." *Ferguson v. State*, 343 Ark. 159, 177, 33 S.W.3d 115, 126 (2000). Nevertheless, there are instances where a statement is so prejudicial that an admonishment could never cure. *See Moore v. State*, 323 Ark. 529, 537, 915 S.W.2d 284, 289 (1996) (holding that the unresponsive testimony that appellant had admitted he killed another woman was so prejudicial that it could not be cured by an admonition to the jury and the trial court abused its discretion in its denial of a motion for mistrial "in the face of such a patently inflammatory and prejudicial statement.") Because of the nature and prejudice attached to Mrs. Hart's statement, we find that the trial court abused its discretion when it failed to grant the motion for mistrial.

Having determined that a mistrial was warranted, we now turn to the admissibility of other statements that are likely to be an issue during Appellant's retrial.

## B. Joshua Green

Second, Appellant argues that Joshua Green's testimony was improperly allowed. Specifically, Appellant claims that Joshua's testimony that his dad had always been on the outside of the law and had physically abused him from the time he was a child was improper character evidence. During Joshua's testimony, Appellant made a Rule 403 objection on the basis that the prejudice resulting from the testimony was going to substantially outweigh any probative value it might have. The trial court overruled the objection as to specific prior bad acts "in that it is coming in under 40[4](b) with the concept of control which is the major part of their case. . . . [t]he probative value will far outweigh any prejudicial effect."[6] In introducing this testimony, the State sought to demonstrate that Appellant's abusive and controlling behavior played a part in the commission of the murders. Specifically, the State argued that "the control that [Appellant] had over his family explains why none of them ever came to the police until he got arrested. It explains why Chad did what he did." The trial court took this into consideration and overruled Appellant's objections to the testimony. Upon review, we find that the trial court abused its discretion in allowing Joshua's "control" testimony because it is not relevant evidence.

---

[6] The trial court also gave Appellant a continuing objection on these acts.

The State's claim that the evidence was admissible because it was not offered to prove Appellant abused his family, but rather to show the control he had over the family, has no merit. First, control is not an issue in this case. Appellant was charged with four counts of capital murder and kidnapping. Therefore, the control he may or may not have had over his family is not independently relevant to whether he committed the crimes. Second, the State's "control" argument deals more with Joshua's credibility as related to his delay in coming forward rather than Appellant's guilt. The credibility of a witness is not the subject of Rule 404(b) and, as such, cannot be the basis for allowing testimony of other bad acts.

Finally, Joshua's statements that his father was outside the law and that Appellant physically abused him were more prejudicial than probative. We must again note that Appellant was charged with the murder of the Elliott family and the kidnapping of Felicia, not with ordering a member of his family to commit these crimes; therefore, control was not a main issue at trial. Joshua's statements painted a picture to the jury that Appellant was a controlling, abusive father. Whether or not this was true, it was not independently relevant to the present case. Consequently, the trial court abused its discretion in admitting this testimony under Rule 404(b).

### C. Amber Green

The third testimony Appellant claims was improperly allowed is that of Amber Green. Appellant objected to Amber's testimony that her dad was abusive to her brother and her mother, and that he had once held a gun to her mother's head and told her to "say her prayers." During trial, Appellant objected to the State's questions regarding her father's abuse, claiming that it constituted improper testimony of prior bad acts. The trial court overruled the objection under Rule 404(b). Just as with Joshua's testimony, the trial court allowed Amber's testimony as being relevant to Appellant's control over his family. As noted above, the trial court abused its discretion in allowing "control" testimony. Amber's statements are just as prejudicial as those made by Joshua, and were improperly allowed. There was no relevance or basis for allowing continual testimony that Appellant was abusive and controlling.

### D. Chad Green

Fourth, Appellant claims that Chad Green's statements, that it was a common thing for him to smoke methamphetamine with

Appellant and that Appellant made him do other things he did not want to do, such as steal, were improperly allowed. Although a review of the record reflects that Appellant did not make a contemporaneous objection to Chad's statement that he commonly smoked methamphetamine with Appellant, we will examine the statement for prejudice and error as required by Rule 10(b). The trial court allowed Chad's testimony about Appellant forcing him to steal under Rule 404(b), just as the court had allowed prior Green family testimony on Appellant's control of the family.

■ Upon review, the trial court erred in allowing both statements. First, Chad's testimony about smoking methamphetamine had no independent relevance to the State's case that Appellant committed the murders and kidnapping. Rather, it demonstrated that Appellant was a drug user — a subject that was not an issue in this case. Second, Chad's specific statement about his father making him do things he did not want to do, such as steal, was not relevant. Specifically, the issue of Chad's stealing under Appellant's direction is not relevant. These two statements merely demonstrated that Appellant had control over Chad and that he was a bad father. We note that Chad was not on trial, Appellant was. As such, there was no valid reason to allow the statements. They were prejudicial and not probative. Therefore, the trial court abused its discretion in allowing the statements.

### E. Mary Green

Fifth, Appellant maintains that Mary Green's testimony was also improperly admitted over his objections. Appellant points to a series of Mary's statements that he deemed to be prejudicial in nature, such as (1) her testimony about Appellant being an abusive husband and father; (2) that she did not pay much attention to Appellant's business because it would just get her in trouble; (3) that she figured Appellant was involved with the Elliott murders; (4) that she had been going to the police for thirty years to get protection from Appellant; (5) that she knew more things about him but could not tell the jury; and (6) that since Appellant's arrest she had been safer than she had ever been since meeting him but she still felt that he would get to her like he always said he would. A review of the record reflects that Appellant did not make a contemporaneous objection to statements two, four, and five, and that the trial court ruled in favor of Appellant's speculation

objection to statement three. Nevertheless, we will still examine all statements for prejudice and error as required by Rule 10(b).

■ Statements one, two, and four involve Mary's testimony as to Appellant's physical and mental abuse. The trial court allowed the testimony, over Appellant's objections that it was character evidence outside the scope of Rule 404(b), because the statement went to the control factor that was a major issue in the trial. As with other Green family testimony, the trial court abused its discretion in ruling that the testimony was admissible. Additionally, statement three reflected Mary's belief that Appellant was involved with the murders. While this statement may be relevant as to whether Appellant committed the crimes, the court properly granted Appellant's speculation objection. Furthermore, statement five was so prejudicial that the court should have stepped in and either issued an admonishment or granted a mistrial. Mary's reference to her further knowledge of Appellant was clearly prejudicial because it amounted to nothing more than speculation on her part as to Appellant's guilt. There was no basis for allowing this testimony and it should not have been allowed.

■ Lastly, the trial court erred in allowing Mary's last statement, that she feels safer since Appellant was arrested. After this statement, Appellant moved for a mistrial, arguing that the statement was inadmissible under Rule 404(b) as it was too prejudicial to Appellant. The trial court ruled that what "basically happened is that you impeached her and he rehabilitated her and she went on and on and on." The court overruled the objection, and offered a limiting instruction to advise the jury to disregard her redirect testimony. The jury was never instructed, however, as Appellant chose not to have the limiting instruction given. The lack of a limiting instruction is irrelevant, however, because an admonishment or curative instruction could not have cured the prejudicial effect of this statement. Mary's statement was improper and unrelated to any portion of the State's case against Appellant. Rather than being relevant to the case, Mary's final statement was highly prejudicial to Appellant because he was again labeled as the abusive and violent husband. In sum, the statement, that he would get to her like he always said he would, was improperly admitted under Rule 404(b), and the trial court abused its discretion in allowing this statement.

### F. *Willie Scott Moffitt*

Lastly, Appellant claims that statements made by Scott Moffitt during his testimony were highly prejudicial and improperly allowed. Appellant argues that although the trial court sustained most of his objections regarding insinuating questions, Moffitt blurted out answers during his testimony. Consequently, the jury was left with the impression that Appellant was an extremely violent drug dealer, who had threatened to kill Moffitt and had beat up Moffitt on two occasions. Appellant also points out that Moffitt went so far as to state that if he was on the jury he would convict Appellant.

With regard to the question about methamphetamine that Appellant claims left the jury with the impression that he was a drug dealer, Appellant objected at trial and the State moved on to another question. Additionally, the objections to Moffitt's other statements about threats and violence were sustained. Moreover, Moffitt's statement that Appellant "beat me down twice" was elicited on cross-examination. Thus, these statements do not constitute reversible error.

█ As required by Rule 10(b), we have reviewed all of Moffitt's statements. Only one statement warrants further discussion — "[i]f I was on the jury, I'd convict him." This statement was made during Appellant's cross-examination, and Appellant immediately motioned for a mistrial. The trial court overruled the motion on the ground that Appellant's counsel had halfway invited this. Appellant asked for an admonition and the trial court granted one as it acknowledged that the comment showed bias. The trial judge informed the jury that they should "disregard and take no thought about what Mr. Moffitt thinks should or should not happen," and specifically pointed out that the statement was not evidence to be considered. Appellant claims that the admonition to the jury was not sufficient and that a new trial must be granted. Appellant primarily relies upon *Shroeder v. Johnson*, 234 Ark. 443, 352 S.W.2d 570 (1962), as his basis for maintaining that the only way to remove the prejudice that resulted from this statement is to grant a new trial. However, this reliance is unmerited.

In *Shroeder*, this court reiterated that there are:

> a class of cases which present argument and remarks so flagrantly prejudicial . . . that the commendable efforts of the trial judge to

eradicate the evil effects of them will be unavailing. In such event, then, a new trial is the only way to remove the prejudice, notwith-standing the judge may have . . . emphatically instructed the jury to disregard the prejudicial statements.

*Id.* at 449, 352 S.W.2d at 573 (quoting *Kansas City Southern Ry. Co. v. Murphy*, 74 Ark. 256, 259-60, 85 S.W. 428, 429 (1905)). There, the court went on to explain that it could not "say with certainty that the jurors were prejudiced . . . but we are less sure that they were not." *Shroeder*, 234 Ark. at 450, 352 S.W.2d at 573. Moreover, the court explained that the reference was improper and the court's admonition "did not tell the jury what and to whom the 'rap sheet' referred, and if it had done so the prejudice probably would have been even greater." *Id.* There, this court concluded that the trial court erred in not granting the mistrial.

In the present case, we are faced with a different situation and a different kind of remark than in *Shroeder*. Here, Moffitt stated that he would convict Appellant if he was on the jury. The trial court made a specific admonition to the jury that instructed them to disregard and ignore what Moffitt thinks should or should not happen. The court specifically instructed the jury to "disregard that last statement about guilt or innocence of the defendant, that is not evidence to be considered by you." This admonishment was sufficient to overcome any prejudice that may have resulted from the statement, especially in light of the other evidence presented to the jury. As such, the trial court did not abuse its discretion by giving the admonishment and denying the motion for mistrial.

## V. Confrontation Clause

Appellant's fifth argument on appeal is that the trial court erred in allowing the hearsay testimony of the victims, and in so doing violated his right to confrontation. Specifically, Appellant contends that the testimony of Dewayne Crommie, Kathy Hart, and John Hart violated his right to confrontation because they each testified about statements made to them by two of the victims, Lisa and Carl Elliott. While the record reflects that Appellant objected to these statements as hearsay, he now argues that their admission was a violation of his confrontation right under the Sixth Amend-ment. This argument is barred because it was not raised below.

To preserve an argument for appeal, there must be an objection in the trial court that is sufficient to apprise the court of the particular error alleged. *Vanesch v. State*, 343 Ark. 381, 37

S.W.3d 196 (2001). This court will not address arguments raised for the first time on appeal. *Id.* Additionally, a party cannot change the grounds for an objection or motion on appeal but is bound by the scope and nature of the arguments made at trial. *Id.* Thus, even a constitutional argument, such as a Confrontation Clause argument, is waived if it is not presented to the trial court. *Echols v. State*, 326 Ark. 917, 936 S.W.2d 509 (1996), *cert. denied*, 520 U.S. 1244 (1997).

In the present case, Appellant's objections were on the basis of hearsay, and he never raised a claim or objection under the Confrontation Clause. As such, his argument is now barred from review.

## VI. Kermit Channel Testimony

For his sixth argument, Appellant argues that the trial court abused its discretion in allowing the testimony of Kermit Channel. Specifically, Appellant objected to Channel's testimony regarding his conclusion that DNA found in blood taken from the trunk carpet of the Elliotts' car matched Felicia's DNA. His objection stems from his claim that the State failed to establish a proper chain of custody of the Elliotts' car, and as such, the results of evidence from that car, i.e., the DNA, was inadmissible.

This court has consistently held that the purpose of establishing a chain of custody is to prevent the introduction of evidence that has been tampered with or is not authentic. *Goodwin v. State*, 342 Ark. 161, 27 S.W.3d 397 (2000); *Dansby*, 338 Ark. 697, 1 S.W.3d 403; *Crisco v. State*, 328 Ark. 388, 943 S.W.2d 582 (1997). While the State is not required to eliminate every possibility of tampering with the evidence, the trial court must be satisfied within a reasonable probability that there has been no tampering. *Id.* Minor uncertainties in the proof of chain of custody are matters to be argued by counsel and weighed by the jury, but they do not render the evidence inadmissible as a matter of law. *Goodwin*, 342 Ark. 161, 27 S.W.3d 397; *Crisco*, 328 Ark. 388, 943 S.W.2d 582. Moreover, the proof of the chain of custody for interchangeable items like blood needs to be more conclusive than for other items of evidence. *Dansby*, 338 Ark. 697, 1 S.W.3d 403; *Crisco*, 328 Ark. 388, 943 S.W.2d 582. Nevertheless, the mere possibility of access to blood, where there is no evidence of tampering, is not enough to render test results from that blood inadmissable. *Dansby*, 338 Ark. 697, 1 S.W.3d 403. Lastly, in matters such as this, the trial court is given some degree of

discretion and in the absence of evidence indicating tampering, we will not reverse the trial court's ruling absent an abuse of discretion. *Gardner v. State*, 296 Ark. 41, 754 S.W.2d 518 (1988). With this in mind, we now look to the present situation.

Here, it is clear that the trial court did not abuse its discretion in finding that the chain of custody was satisfied and, thus, allowing Channel to testify about the DNA evidence. The State presented adequate testimony establishing this chain. Jeff Winebaugh testified that, on July 20, 1998, he towed the Elliotts' car to a locked impound lot. The car was initially placed by itself in a locked, enclosed garage, but was placed outside in the locked impound lot the next day after the company received a call advising them they could put it outside as long as it was locked up. FBI Agent Lowell Cage testified that, on August 5, 1998, he photographed a section of carpet from the trunk of the car. FBI Agent Carl Malloy testified that he did not know if any other police agencies took photographs of the vehicle prior to the FBI getting involved, but that he was involved with the actual removal of items from the trunk. Specifically, Agent Malloy removed the piece of carpet from the trunk for it to be submitted into evidence. Although Agent Malloy did not personally participate in the submission of the evidence to the Arkansas State Crime Laboratory, he explained that he collected evidence and put it in the vehicle for transport to be submitted. Channel testified that he did an analysis on a carpet sample that had been removed from the Elliotts' car. He explained that he analyzed the carpet piece and compared it to Lisa Elliott's blood. In so doing, he found that the DNA profile from the carpet was consistent with that of the one female offspring of Lisa, namely Felicia. This evidence establishes a chain of custody for the carpet piece Channel testified about. Lastly, it should be noted, the trial court did not permit the piece of carpet to be introduced because one of the FBI agents who took it out of the trunk with Agent Malloy was unavailable.

Nevertheless, Appellant infers that tampering was involved and, relying on *Crisco*, 328 Ark. 388, 943 S.W.2d 582, maintains that this court should reverse and dismiss the charges against him. Appellant's argument is without merit because *Crisco* is distinguishable from the present case. In *Crisco*, the description of the seized drug varied significantly between the seizing police officer's description and the chemist's. Moreover, the present case does not involve an easily interchangeable sample, like a drug or blood

sample, because it deals with DNA. Additionally, there is no difference in the description of the carpet sample containing the DNA such as that found in *Crisco*. Consequently, this case is distinguishable from *Crisco*. *See also Goodwin*, 342 Ark. 161, 27 S.W.3d 397 (finding that there was no assertion that the substance introduced at trial differed in appearance or content from the substance seized from the defendant, and, therefore, *Crisco* is not applicable).

Appellant has failed to expose any actual tampering, planting of evidence, or significant gap in the chain of custody. Moreover, the record does not reflect that any of these issues occurred. Consequently, the trial court did not abuse its discretion by admitting the DNA results and allowing Channel to testify.

### VII. Improper Closing Remarks

For his last point on appeal, Appellant argues that the trial court erred by failing to declare a mistrial after the State made an improper remark during closing arguments. Specifically, Appellant's objection arises from the following comment:

> Now Mr. Harper talked a whole lot about how bad the police messed up and what all they didn't find, but you know what he didn't talk about? He didn't talk about where Billy Green was that night. You didn't hear him explain that, did you? And I'll tell you why he didn't explain it because he can't.

A mistrial is a drastic remedy to be used only when an error is so prejudicial that justice cannot be served by continuing the trial and when the prejudicial statement cannot be cured by an instruction. *Jones*, 340 Ark. 390, 10 S.W.3d 449. Moreover, the trial court has the sound discretion to decide whether to grant a mistrial, and this decision will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Id.*

In the present case, we are faced with a situation where Appellant alleges that the State made an improper comment in reference to his failure to testify. If a prosecutor is alleged to have made an improper comment such as this, we review the statements through a two-step test. *Jones*, 340 Ark. 390, 10 S.W.3d 449. First, we determine whether the comment is an improper comment on the defendant's failure to testify. *Id.* It has long been the rule that a prosecutor may not draw attention to the fact of, or comment on,

a defendant's failure to testify. *Id. See also Chapman v. California*, 386 U.S. 18 (1967); *Landreth v. State*, 331 Ark. 12, 960 S.W.2d 434 (1998). These comments are not allowed, because to do otherwise, makes the defendant testify against himself in violation of the Fifth Amendment. *Id.* Moreover, a veiled reference to the defendant's failure to testify is also improper. *Id.* Second, if this court determines that a prosecutor did refer to the defendant's choice not to testify, we then determine whether it can be shown beyond a reasonable doubt that the error did not influence the verdict. *Jones*, 340 Ark. 390, 10 S.W.3d 449. *See also Chapman*, 386 U.S. 18. With this standard in mind, we now turn to the present case.

Here, we believe that the prosecutor's comment did not refer to Appellant's failure to testify, and as such was not improper. The statement referred to Appellant's counsel's remarks during opening statements that Appellant "wasn't there and you'll see when you hear Chad's testimony and the testimony of other people how he couldn't have been there." Thus, this was something that the prosecutor could comment on. Therefore, the trial court did not err in failing to grant the mistrial.

### VIII. 4-3(h) Review

In accordance with Ark. Sup. Ct. R. 4-3(h), the record has been reviewed for adverse rulings objected to by the Appellant but not argued on appeal. No additional reversible errors were found.

Reversed and remanded for a new trial.

BROWN, J., concurs.

GLAZE, DICKEY, and GUNTER, JJ., dissent.

ROBERT L. BROWN, Justice, concurring. I concur with much of the the majority opinion and the result and write only to emphasize certain salient points regarding the "Bad Acts" point and the need for admonitions from the bench.

In my opinion, our analysis should initially focus on whether the circuit judge abused his discretion by not intervening to correct serious error in the guilt phase, even though the error was not objected to, under Arkansas Rule of Appellate Procedure – Criminal 10(b)(iv) or, alternatively, abused his discretion by failing to correct an evidentiary error that affected a substantial right of Green's under Arkansas Rule of Appellate Procedure – Criminal

10(b)(v). A violation of Rule 404(b) of the Arkansas Rules of Evidence gives us some guidance as to whether serious error or error affecting a substantial right has occurred.

I agree with the majority that Green's control over his family is not independently relevant as evidence that he committed the murders. Nor is it relevant as corroborative evidence of accomplice testimony. Nevertheless, I believe that in most, if not all, of the incidents of bad-acts testimony discussed by the majority, an admonition to the jury would have cured the error as opposed to a declaration of a mistrial.

For Kathy Elliott Hart's testimony, it was serious error for the circuit judge not to admonish the jury to disregard her testimony about her nephew Shane's mysterious death after the theft of marijuana plants. Such testimony was extremely prejudicial, in that it indicated that Green was culpable in a murder for which he had not been charged. *See, e.g., Walls v. State*, 336 Ark. 490, 986 S.W.2d 397 (1999). The circuit judge should have stepped in even though defense counsel never specifically asked for an admonition after the judge offered it to him. This failure to admonish the jury was the abuse of discretion in my judgment rather than the failure to declare a mistrial.

For Joshua Green, I agree with the majority that Joshua's testimony that his father operated "outside the law" and had physically abused him was more prejudicial than probative under Rule 403. This, too, was a "serious error" under Rule 10(b)(iv), and the circuit judge should have intervened and admonished the jury to disregard it. Failure to correct the serious error by admonishment was another abuse of discretion in my judgment.

In the case of Amber Green, the most prejudicial testimony from her concerned Green's holding a gun to Mary's head and telling her to "say her prayers." I agree with the majority that Green's spousal abuse had no relevance to his guilt. The fact that Green exercised control over his wife and abused her is not probative of whether Green was guilty of the murders. For that reason, the circuit judge had a clear obligation to step in and correct the error.

Similarly, Chad Green's statements that he smoked methamphetamine with his father, who also made him steal, were clearly irrelevant in the murder trial and prejudicial. Again, the specific abuse of discretion was in failing to admonish the jury for purposes of correcting the error under Rule 10(b)(iv).

With regard to Mary Green, there was serious error in her testimony (1) that Green was an abusive father and husband; (2) that she thought Green was involved in the Elliott murders, and (3) that she knew more about the matter at hand than she was allowed to mention. All of this testimony constituted either serious error or an evidentiary error affecting Green's substantial rights. An admonishment should have been made to the jury to correct the resulting prejudice.

As a final point, the testimony of the jailhouse "snitch," Willie Scott Moffitt, about Green's threats and violence toward him had no relevance to his murder of the Elliotts in the guilt phase. Nor does it fit within a Rule 404(b) exception. An admonishment by the circuit judge was required.

For these reasons, I would reverse the judgment of conviction and remand for a new trial.

JIM GUNTER, Justice, dissenting. I respectfully dissent. This case should be affirmed because the evidence of prior crimes and bad acts of Billy Dale Green are admissible under Ark. R. Evid. 404(b) to show appellant's motive and intent to commit these heinous crimes. Although control is not specifically listed as evidence that may be independently relevant and admissible under Rule 404(b), motive and intent are specifically listed exceptions under the rule. Thus, appellant's control over his family is relevant to show motive and intent to commit these horrible acts that resulted in the death of an entire family, including two young children.

Appellant moved for a mistrial. A mistrial is a drastic remedy to be used only when an error is so prejudicial that justice cannot be served by continuing the trial and when the prejudicial statement cannot be cured by an instruction. *Jones v. State,* 340 Ark. 390, 10 S.W.3d 449 (2000). The trial court has the sound discretion to decide whether to grant a mistrial, and this decision will not be overturned absent a showing of abuse or upon manifest prejudice to the complaining party. *Id.* Additionally, even if the remark is improper, the trial court may deny the mistrial motion and cure any prejudice by issuing a jury admonishment to disregard the remark. *Dandridge v. State,* 292 Ark. 40, 727 S.W.2d 851 (1987).

Arkansas Rule of Evidence 404 provides, in part:

> (a) *Character Evidence Generally.* Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:

(1) *Character of accused.* Evidence of a pertinent trait of his character offered by an accused, or by prosecution to rebut the same;

. . . .

(b) *Other Crimes, Wrongs, or Acts.* Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

*Id.* Rule 404(b) "permits introduction of testimony of other criminal activity if it is independently relevant to the main issue, that is, relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal." *Spencer v. State,* 348 Ark. 230, 236, 72 S.W.3d 461, 464 (2002). The State is entitled to produce evidence showing circumstances which explain the act, show a motive for the killing, or illustrate the accused's state of mind. *Barrett v. State,* 354 Ark. 187, 119 S.W.3d 485 (2003). In dealing with issues relating to the admission of evidence pursuant to Rule 404(b), a trial court's ruling is entitled to great weight, and this court will not reverse absent an abuse of discretion. *Barnes v. State,* 346 Ark. 91, 55 S.W.3d 271 (2001). Further, this court has held that the list of exceptions to inadmissibility in Rule 404(b) is not an exclusive list, but instead, it is representative of the types of circumstances under which evidence of other crimes, wrongs, or acts would be relevant and admissible. *Diffee v. State,* 319 Ark. 669, 894 S.W.2d 564 (1995). Therefore, I would hold that the circuit court did not abuse its discretion by admitting the testimony concerning appellant's control over his family.

## Testimony of Green Family

Appellant argues that the circuit court erred by allowing the testimony of Joshua, Amber, Chad, and Mary Green regarding appellant's control and abusive treatment of his family. This argument has no merit. The testimony of appellant's children and wife is admissible to prove that he had control over his family, not to prove that appellant committed the crime. The testimony proves that appellant had the intent to use his family members to commit these crimes because they were too scared of appellant to say no and walk away. The testimony also showed that the fear

appellant instilled in his family was so great that they were afraid to come forward with any information until appellant was behind bars. Appellant's control over his family is relevant to show his intent to commit these murders. His control goes to the issue of premeditation and deliberation. Moreover, these statements were not more prejudicial than probative. The trial court did not abuse its discretion by allowing this testimony under Rule 404(b), and appellant's argument regarding the issue of control is meritless.

Regarding the testimony of Mary Green concerning her safety after appellant's arrest, the trial court ruled that what "basically happened is that you impeached her and he rehabilitated her and she went on and on and on." The court overruled the objection and offered a limiting instruction to advise the jury to disregard her redirect testimony. However, appellant chose not to have the limiting instruction given. As such, even if the remark were improper, the trial court may deny the mistrial motion and cure any prejudice by issuing a jury admonishment to disregard the remark. *Dandridge*, 292 Ark. 40, 727 S.W.2d 851. Here, appellant declined a jury admonishment or a limiting instruction even though the trial court offered one. Appellant cannot prove any prejudice. Therefore, the trial court did not abuse its discretion.

### Testimony of Kathy Elliott Hart

Appellant also claims that the testimony of Kathy Elliott Hart was improperly allowed. Kathy testified that she was afraid for her brother to be around the Greens because her nephew had died mysteriously after he had stolen some of appellant's marijuana plants. Appellant immediately objected to this statement and moved for a mistrial. The trial court overruled the mistrial motion, but offered a limiting instruction. Appellant never clearly accepted the offer, and a limiting instruction was not given. Upon reviewing this testimony and appellant's objections to it, it is clear that the circuit court did not abuse its discretion by denying the motion for mistrial. The statements fell within Rule 404(b), as they established motive on the part of appellant. The motive was anger for the theft of the marijuana plants. Therefore, appellant's argument is meritless.

Appellant had the intent to premeditate and deliberate the murders of the Elliot family. Further, he had the intent to use the control over his own family to make them help him commit these unspeakable crimes. The evidence should be admissible under the intent exception to Rule 404(b). The evidence in this case is

overwhelming. The circuit court did not abuse its discretion. Therefore, this case should be affirmed.

GLAZE and DICKEY, JJ., join.